No. 14-1219

_____

IN THE

# United States Court of Appeals
# for the Federal Circuit

_____

**M.Z. BERGER & CO., INC.,**

*Appellant,*

– v. –

**SWATCH AG (SWATCH SA) (SWATCH LTD.),**

*Appellee.*

_____

**On Appeal From a Decision of the Trademark
Trial and Appeal Board in Opposition No. 91187092**

_____

**NON-CONFIDENTIAL BRIEF OF APPELLANT**

_____

Samson Helfgott
Jessica Garrett
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022
212-940-8800

Howard R. Rubin
  *Counsel of Record*
Robert T. Smith
Daniel Lipton*
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, NW – Suite 200
Washington, DC 20007
202-625-3500

*Counsel for Appellant M.Z. Berger & Co., Inc.*

\* Licensed to practice only in New York; supervised by Principals of the Firm.

# CERTIFICATE OF INTEREST

Consistent with Federal Rule of Appellate Procedure 26.1 and Federal Circuit Rule 47.4, counsel for Appellant M.Z. Berger & Co., Inc. certifies the following:

1.   The full name of every party or amicus represented by me is:

     M.Z. Berger & Co., Inc.

2.   The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

     The real party in interest is the same as the party represented by me.

3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

     M.Z. Berger & Co., Inc. is a privately-held company.  There are no parent corporations or any publicly-held companies that own 10 percent or more of the stock of M.Z. Berger & Co., Inc.

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

     Katten Muchin Rosenman LLP:  Howard R. Rubin, Samson Helfgott, Robert T. Smith, Jessica Garrett, Daniel Lipton, and Michael F. Sarney (no longer with Katten Muchin Rosenman LLP).

Dated:  May 2, 2014             /s/ Howard R. Rubin
                                Howard R. Rubin
                                *Counsel for Appellant*
                                *M.Z. Berger & Co., Inc.*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .................................................................i

TABLE OF AUTHORITIES ...................................................................v

STATEMENT OF RELATED CASES ..................................................viii

INTRODUCTION..................................................................................1

JURISDICTIONAL STATEMENT .........................................................3

STATEMENT OF THE ISSUES..............................................................4

STATEMENT OF THE CASE .................................................................4

SUMMARY OF THE ARGUMENT ......................................................16

STANDARD OF REVIEW....................................................................20

ARGUMENT ......................................................................................21

I.   The Board Erred in Concluding that M.Z. Berger Lacked a Bona Fide Intent to Use the iWatch Mark in Commerce .............21

    A.   The Standard Adopted by the Board is Inconsistent with the Trademark Law Revision Act of 1988 ............................22

        1.   15 U.S.C. § 1051(b) Requires Only a Bona Fide Intent to Use, Not Actual Promotion, Development, and Marketing..............................................................23

        2.   Congress Envisioned a Low Standard for Demonstrating an Applicant's Bona Fide Intent to Use..................................................................................24

        3.   The Objective Evidence Demonstrates That M.Z. Berger Has a Bona Fide Intent to Use the iWatch Mark in Commerce.......................................................28

        4.   In Holding That M.Z. Berger Lacked the Requisite Intent, the Board Ignored Objective Evidence in Violation of Its Own Precedent and the Low-Standard Established by Section 1051(b) ...................31

B. The Standard Adopted by the Board Conflicts with the Statutorily-Mandated Administrative Review Process and with the Patent and Trademark Office's Own Regulations..........................................................................37

1. The Application and Registration Process Does Not Require Proof of Actual Use Until Later in the Process..............................................................................38

2. The Board Departed from the Statute and the Patent and Trademark Office's Own Regulations When It Required M.Z. Berger to Produce Evidence of Promotion, Development, or Marketing Activities Before Receiving the Notice of Allowance...41

C. The Standard Adopted by the Board Requires Businesses to Engage in Unnecessary and Expensive Brand-Building Efforts Before Applying for a Trademark..43

II. The Board Correctly Found That There Is No Likelihood of Confusion Between the iWatch and Swatch Marks......................44

CONCLUSION ...........................................................................47

ADDENDUM – OPINION OF THE BOARD .........................................A1

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## Confidential Material Omitted

The material omitted in the first sentence of page 5 describes M.Z. Berger & Co., Inc.'s annual revenue derived from sales of watches.

The material omitted in the second sentence of page 5 describes M.Z. Berger & Co.'s retail outlets for its watches.

The material omitted on page 7 describes the target retail price for M.Z. Berger & Co., Inc.'s iWatch-branded watch.

The material omitted on page 10 describes the cost for M.Z. Berger & Co., Inc. to prepare a sample timepiece for promotional purposes.

The material omitted in the third sentence of page 11 describes evidence in the record regarding consumer perceptions of the iWatch and SWATCH marks.

The material omitted following the fourth sentence on page 11 describes retail outlets for Swatch's watches and Swatch's competitors in the United States.

## <u>TABLE OF AUTHORITIES</u>

<u>C</u>ASES:

*Adver. to Women, Inc. v. Gianni Versace S.p.A.*,
    No. 98-cv-1553, 2000 WL 1230461 (N.D. Ill. Aug. 24, 2000) ......... 36

*Allard Enters., Inc. v. Advanced Programming Res., Inc.*,
    146 F.3d 350 (6th Cir. 1998) ......................................................... 24

*Application of E.I. DuPont DeNemours & Co.*,
    476 F.2d 1357 (C.C.P.A. 1973) .................................................... 45

*Aycock Eng'g, Inc. v. Airflite, Inc.*,
    560 F.3d 1350 (Fed. Cir. 2009) ............................................ *passim*

*Bose Corp. v. QSC Audio Prods., Inc.*,
    293 F.3d 1367 (Fed. Cir. 2002) .................................................... 45

*Cunningham v. Laser Golf Corp.*,
    222 F.3d 943 (Fed. Cir. 2000) ...................................................... 45

*Eastman Kodak Co. v. Bell & Howell Document Mgmt. Prods. Co.*,
    994 F.2d 1569 (Fed. Cir. 1993) .......................................... 17, 27, 37

*Honda Motor Co. v. Winkelman*, 90 U.S.P.Q.2d 1660,
    2009 WL 962810 (Trademark Tr. & App. Bd. Apr. 8, 2009) ......... 33

*In re Becton, Dickinson & Co.*,
    675 F.3d 1368 (Fed. Cir. 2012) .................................................... 21

*In re Pacer Tech.*,
    338 F.3d 1348 (Fed. Cir. 2003) .................................................... 21

*In re Save Venice N.Y., Inc.*,
    259 F.3d 1346 (Fed. Cir. 2001) .................................................... 21

*Loreal S.A. v. Marcon*, 102 U.S.P.Q.2d 1434, 2012 WL 1434
    (Trademark Tr. & App. Bd. Mar. 20, 2012) ....................... 30, 31, 36

*Recot, Inc. v. M.C. Becton,*
    214 F.3d 1322 (Fed. Cir. 2000)......................................................21

*Research in Motion Ltd. v. NBOR Corp.*, 92 U.S.P.Q.2d 1926,
    2009 WL 4694941 (Trademark Tr. & App. Bd. Dec. 2, 2009).......33

*Speedway Superamerica LLC v. Renegade Tobacco Inc.*, No.
    91124822, 2004 WL 2075108 (Trademark Tr. & App. Bd.
    Sept. 2, 2004).................................................................................31

*Wet Seal, Inc. v. FD Mgmt., Inc.*, No. 91157022, 2007 WL 458529
    (Trademark Tr. & App. Bd. May 15, 2007).............................17, 30

## FEDERAL STATUTES:

Trademark Law Revision Act of 1988,
    Pub. L. No. 100-667, 102 Stat. 3935 (1988).............................16, 24

15 U.S.C. § 1051(b)......................................................................4, 16, 38

15 U.S.C. § 1051(b)(1)...............................................................23, 30, 31

15 U.S.C. § 1051(b)(3)(B).....................................................................23

15 U.S.C. § 1051(d)........................................................................27, 42

15 U.S.C. § 1051(d)(1).................................................................*passim*

15 U.S.C. § 1051(d)(2).................................................................*passim*

15 U.S.C. § 1062(a)................................................................................38

15 U.S.C. § 1063(a)................................................................................38

15 U.S.C. § 1063(b)(2).................................................................*passim*

15 U.S.C. § 1067(a)..................................................................................3

15 U.S.C. § 1071(a)(1)..............................................................................3

15 U.S.C. § 1071(a)(2)..............................................................................3

18 U.S.C. § 1001 ......................................................................... 10

28 U.S.C. § 1295(a)(4)(B) ............................................................ 3

**FEDERAL REGULATIONS:**

37 C.F.R. § 2.89(a)(2) ................................................................. 39

37 C.F.R. § 2.89(b) ..................................................................... 39

37 C.F.R. § 2.89(d) ............................................................. *passim*

37 C.F.R. § 2.101 ....................................................................... 38

**OTHER AUTHORITIES:**

H.R. Rep. No. 100-1029 (1988) ........................................... *passim*

S. Rep. No. 100-515 (1988) ................................................. *passim*

Sandra Edelman, *Proving Your Bona Fides—Establishing Bona Fide Intent to Use Under the U.S. Trademark (Lanham) Act,* 99 Trademark Rep. 763 (2009) ................................................ 36, 43

3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (4th ed. 2004) ....................................................... 16, 24

## STATEMENT OF RELATED CASES

Consistent with Federal Circuit Rule 47.5, counsel for Appellant M.Z. Berger & Co., Inc. provide the following Statement of Related Cases:

(a)    Appellees filed a notice of cross-appeal from the same decision of the Trademark Trial and Appeal Board that is the subject of this appeal.  The cross-appeal was docketed as Case No. 14-1220, but it was ultimately dismissed as improvidently filed by an order of the Court entered on March 19, 2014.

(b)    There is no case, known to counsel, pending in this or any other court that will directly affect, or be directly affected by, this Court's decision in this appeal.

# **INTRODUCTION**

This case presents a matter of first impression for this Court about the proper standard to apply at the early stages of an intent-to-use trademark application filed under 15 U.S.C. § 1051(b)(1). That subsection simply requires an applicant to make a verified statement that he or she has "a 'bona fide intention to use the mark in commerce' at a later date," *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357–58 (Fed. Cir. 2009) (quoting 15 U.S.C. § 1051(b)); it was added to allow an applicant to obtain priority in a trademark *before* "making a sizable investment in packaging, advertising and marketing." S. Rep. No. 100-515, at 23 (1988). In contrast, a separate subsection provides that an applicant will eventually be required to submit evidence of actual use of the applied-for mark in commerce, but only after it receives a notice of allowance from the Patent and Trademark Office confirming that its mark is, in fact, registrable. *See* 15 U.S.C. § 1051(d)(1), (2) (providing an applicant with a minimum of six months after receiving a notice of allowance in which to file a verified statement of actual use of a mark in commerce, and thereafter allowing one automatic extension of 6 months

and subsequent extensions of up to 24 months in which to furnish such a statement).

The Trademark Trial and Appeal Board, however, never allowed M.Z. Berger & Co., Inc.'s intent-to-use application for the mark "iWatch" to reach the notice-of-allowance stage. Instead, after Swatch AG filed a notice of opposition, the Board altered the intent-to-use process when it faulted M.Z. Berger for failing to produce documentary evidence of "promotional" material or "effort[s] to develop and market" a product bearing the applied-for mark at the time the company filed its initial application. J.A. 24, 32. This was error.

In the process, the Board discounted a variety of evidence demonstrating M.Z. Berger's good faith intent to use the mark in commerce. M.Z. Berger has a sixty-year history in the watch business and a long-standing practice of designing, developing, and selling proprietary watches under its own trademarks. In addition, the company submitted evidence that it intended to develop the iWatch brand through product-development meetings in which the company discussed price points, potential vendors, appearance, and logo design,

and the company came up with a logo and renderings of a finished watch.

None of this evidence is reasonably subject to dispute, and yet the Board discounted all of it—apparently because, in the Board's view, the Company's efforts did not sufficiently approach actual use of the mark in commerce. The Board's decision should be reversed in this respect, and the case should be remanded with instructions that the Patent and Trademark Office deny Swatch's opposition and issue a notice of allowance to M.Z. Berger for the iWatch mark.

## JURISDICTIONAL STATEMENT

The Trademark Trial and Appeal Board had jurisdiction over this trademark opposition proceeding pursuant to 15 U.S.C. § 1067(a). On September 30, 2013, the Board issued a final decision refusing to register the mark in question. J.A. 1–33. On November 26, 2013, M.Z. Berger filed a notice of appeal to this Court within the 60 days prescribed by 15 U.S.C. § 1071(a)(2). J.A. 2134. As such, this Court has jurisdiction over this appeal pursuant to 15 U.S.C. § 1071(a)(1) and 28 U.S.C. § 1295(a)(4)(B).

## STATEMENT OF THE ISSUES

1.      Whether the Board erred by applying an overly stringent standard at the early stages of an intent-to-use application filed under 15 U.S.C. § 1051(b) by requiring evidence approaching actual use of the trademark in commerce in violation of the Trademark Law Revision Act of 1988, Pub. L. No. 100-667, 102 Stat. 3935, and the Patent and Trademark Office's own regulations.

2.      Whether the Board properly held that there was no likelihood of confusion between the iWatch mark and the Swatch mark, which are substantially different in sound, appearance, and commercial impression.

## STATEMENT OF THE CASE

1.      M.Z. Berger & Co. entered the watch business in 1952.  J.A. 1245.  In the more than sixty years that have followed, the company has grown from a small showroom off of Fifth Avenue in Manhattan (J.A. 939) into a major "manufacture[r]" and "import[er]" of watches (J.A. 1759).  M.Z. Berger now employs over 700 men and women and has corporate offices in New York, Hong Kong, China, and Canada, and satellite offices across the United States.  J.A. 938.  It sells roughly 20

CONFIDENTIAL MATERIAL REDACTED

million timepieces annually (J.A. 939), which translates into roughly

 in sales derived from watches alone (J.A. 1247).

Most of these sales are to ███████████████████████████████████

████████████; the balance of the company's sales are to ██████████

███████████████████████████████████████████████████████████

███████████████████████████████████. J.A. 1853.

M.Z. Berger is not only an importer and reseller of watches; it also

develops, designs, and then sells its own line of proprietary brands of

watches. *E.g.*, J.A. 938, 940–41, 1759–61, 1852. Indeed, the record

includes evidence that—both before and after M.Z. Berger attempted to

register the mark in question—the company had filed and ultimately

marketed watches under a variety of other trademarks. *See* J.A. 1224–

25, 1271–84 ("iKidz"); J.A. 1227–28 ("Galaxy"); J.A. 1230–31 ("Jack of

Hearts"); J.A. 1233–34 ("Sache"); J.A. 1242–43 ("Studio Time").

2. Sometime in 2007, M.Z. Berger came up with the idea to use

the name "iWatch" as a brand to market a line of watches. *See* J.A.

2043; *see also* J.A. 845. At the time the company's Chief Executive

Officer, Bernard Mermelstein, "came up with" the idea for the name, he

thought it would be a good name for a brand "if [the company] decided

to do [an] information watch or something that would have that type of characteristic[].” J.A. 845; *see also* J.A. 15.

Soon thereafter, the company held an initial meeting to discuss the iWatch name. *See, e.g.*, J.A. 1765–66, 1860–61, 1887. During this meeting, the company discussed potential features for such a line of watches. *E.g.*, J.A. 1766–67, 1861–62. With the technology craze “relating to iPods and iHome and I-everything” (J.A. 1766), most at the company agreed that the line should have “some sort of [technological] feature as part of the watch” (J.A. 1812; *see also* J.A. 1767), though others thought the brand would still work if the watch simply had “the look and feel of tech” (J.A. 1894). Following this initial meeting, however, one thing was certain: “[W]e all decided, after we left that meeting, that [the iWatch name] was something we were going to pursue.” J.A. 1766.

Consistent with this consensus, the company had several more meetings about iWatch, including several meetings within the merchandising department. J.A. 1767. During these meetings, the company discussed “what the logo should and could look like” (J.A. 1767), potential accounts and vendors (J.A. 1768), a target price of

CONFIDENTIAL MATERIAL REDACTED

around ▮ retail (J.A. 1769, 1814, 1862), and even potential colors (J.A. 1825).  Moreover, during these meetings, the company ultimately decided that the logo should have "a small I" and a "capital W" (J.A. 2044).

Prior to filing its intent-to-use application, the company also conducted a trademark search to determine whether the iWatch mark was available for use in commerce.  J.A. 19, 1251, 1966–67, 1987–2003. Based on these results, the company determined that the mark was available.  *See* J.A. 1967.

On July 5, 2007, the company's Licensing and Business Affairs Manager, Monica Titera, filed an initial intent-to-use application for the iWatch mark with the Patent and Trademark Office.  J.A. 40–46.  She sought to register the mark for watches, clocks, and subsidiary goods. J.A. 41.

During the prosecution of the initial application for the mark, the company submitted samples of potential "promotional materials for both watches and clocks."  J.A. 65; *see also* J.A. 227 (sample clock); J.A. 228 (sample watch).  These sample promotional materials depict watches and clocks with a technological look and feel (J.A. 227–28; *see*

*also* 757–58), and they include a stylized iWatch logo, which looks like an electric circuit (J.A. 761). In addition, an alternative logo was prepared that gives the appearance of computer pixels. J.A. 763.

Although the company's CEO and Rule 30(b)(6) witness did not seem to know for sure whether the renderings had been shown to a buyer, *see* J.A. 29, 855, other testimonial and documentary evidence reinforces that the images were, in fact, shown to a buyer, *see* J.A. 1252, 1254 (Titera) (stating that the renderings were shown to a buyer); J.A. 76 (statement to the Patent and Trademark Office suggesting that the renderings were shown to a buyer). In fact, Ms. Titera sent an e-mail to Mr. Mermelstein, explaining that the images had been prepared "to show a buyer," but the "buyer decided that models which previously had interactive features [would be] too expensive." J.A. 2033.

Although the Board determined that the renderings were not shown to a buyer, *see* J.A. 24, there was no real dispute that the company ran the iWatch name past at least one buyer. The company's Vice President of Merchandising, Brenda Russo, testified that she "recall[ed] having discussions with one or two buyers" about the iWatch

name during Market Week (J.A. 1779), which is held five times a year (J.A. 1776).[1]

Also during the course of prosecuting the application for the mark, M.Z. Berger clarified that the "i" does not necessarily "have any significance as applied to the goods." J.A. 55. The company noted that "some (but not all) of the goods bearing the 'iWatch' name [will] have interactive features, such as weather applications." *Id.* Indeed, the company would later re-clarify that the "i" does not necessarily "refer to any particular feature of the watches." J.A. 75. According to the company, a prospective buyer had decided that models with interactive features were too expensive. *Id.* As a result, the company ultimately decided that "there will be no interactive features on any models." J.A. 75.

Importantly, during the prosecution of its application, the company declared that it "has a bona fide intention to use . . . the mark

---

[1] Although Ms. Russo could not recall the buyer's name, the buyer's company, or the time of the meeting, she was sure the meeting happened, and she was sure that the prospective buyer was a woman. J.A. 1808–09. Ms. Russo also testified that she attends up to 300 meetings a year (J.A. 1790), and that during these meetings she might show buyers more than 1000 watches (J.A. 1791), which helps explain the limited nature of her recall. She testified that she did not keep notes from these meetings. J.A. 1816.

*CONFIDENTIAL MATERIAL REDACTED*

in commerce." J.A. 57. Indeed, Ms. Titera made such a declaration after being warned that "willful false statements" are "punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001." *Id.*

Ultimately, the Patent and Trademark Office determined that the iWatch mark "appears to be entitled to registration." J.A. 90. As a result, it issued a notice of publication under Section 12(a) of the Trademark Act of 1946. *Id.*

Throughout the course of prosecuting the application, M.Z. Berger continued to develop the mark for use in commerce. It suspended these activities only after a notice of opposition was filed with the Trademark Trial and Appeal Board (*e.g.*, J.A. 986, 1769, 1823–25, 1864, 2059–60), and it conceded that it no longer had an intention to use the iWatch mark on clocks, but only well after that notice was filed (J.A. 813, 848). As Marci Gordon, the company's Chief Merchant and Marketing Officer, explained: "[I]t's costly for product development. It costs anywhere from ███████████ to tool up a sample. I will not approve a sample to be tooled up [with] that expense if I think that there's a potential conflict." J.A. 1864–65; *accord* J.A. 1825.

*CONFIDENTIAL MATERIAL REDACTED*

3.    On October 22, 2008, Swatch filed a notice of opposition to registration of the iWatch mark.  J.A. 91–99.  At the time, Swatch only asserted claims for likelihood of confusion and dilution.  J.A. 96–98.  That said, Swatch would eventually concede that it did not "  "  J.A. 1409.  And Swatch all but conceded that it did not view a company like M.Z. Berger as a real competitor.  *See* J.A. 1314.  (

.)

Nevertheless, Swatch essentially maintained that any watch sold with a letter in front of the word "watch" would be confusingly similar with the Swatch brand (*see* J.A. 1409)—no matter how dissimilar in sound, appearance, and commercial impression those marks might be.

At a time when only claims for likelihood of confusion and dilution were pending, Swatch deposed Mr. Mermelstein, who had been designated by M.Z. Berger as a witness pursuant to Federal Rule of Civil Procedure 30(b)(6).  During his deposition, Mr. Mermelstein

admitted his lack of familiarity with certain aspects of the company's efforts to create an iWatch brand (*see* J.A. 824) (Mermelstein) (noting that he had "some knowledge" but did not "have necessarily all the knowledge"), including a lack of knowledge surrounding efforts by the company to show renderings of iWatch products to potential buyers. *See* J.A. 855. Based on this, Swatch sought leave to file an amended notice of opposition that would include claims for lack of bona fide intent and fraud, along with claims that the mark was void as both descriptive and misdescriptive. *See* J.A. 125–27; *see also* J.A. 167–77 (proposed amended notice of opposition). The Board granted in part and denied in part Swatch's motion, allowing it leave to assert additional claims for only lack of bona fide intent and fraud. J.A. 528–33. Swatch petitioned the Director of the Patent and Trademark Office to reverse the Board's order, but that petition was denied. J.A. 667–71.

Thereafter, Swatch submitted argument related only to its claims for likelihood of confusion and lack of bona fide intent. J.A. 2. As a result, the Board deemed "waived the additional grounds for opposition that [Swatch] pled but did not argue in its brief"—*i.e.*, the fraud claims. *Id.*

4.   On September 30, 2013, the Board issued a precedential ruling.  *See* J.A. 1–33.  It sustained the opposition, but solely as to the issue of lack of bona fide intent.  J.A. 33.

On the issue of likelihood of confusion, the Board found that the incorporation of the term "watch" into both parties' marks "is not a sufficient basis for finding likelihood of confusion."  J.A. 13.  The Board found that the mark iWatch "differs significantly from opposer's mark SWATCH in sound, meaning, and overall commercial impression."  J.A. 14.  For example, the Swatch mark is "a distinctive, one-syllable term beginning with the sibilant consonant blend 'SW,'" whereas the iWatch mark is "a two-syllable telescoping of the terms 'I' and "WATCH" beginning with the long "I" vowel sound."  *Id.*  In addition, the Board noted that "even the letters 'I' and 'S'—likely to draw attention as initial letters—are readily distinguishable in both appearance and in meaning."  J.A. 14–15.  The Board then continued:  "Viewed in the context of applicant's identified goods, the initial term 'I' could lend itself to a number of different consumer interpretations, including as a well-established reference to 'interactive'; a personal pronoun; or a double entendre playing on the verb form of the term 'watch.'  Opposer's

mark SWATCH has none of these meanings." J.A. 15. Thus, despite the fact that both marks were related to watches, the Board held that Swatch had failed to sustain its burden of establishing a likelihood of confusion between the marks. J.A. 16.

Although the Board found, in essence, that Swatch was not harmed by M.Z. Berger's use of the iWatch mark in commerce (because the marks were not confusingly similar), it went on to consider Swatch's claim of a lack of bona fide intent. J.A. 16–33. Here, the Board held that M.Z. Berger did not have a bona fide intent to use the iWatch mark in commerce based principally on what the Board perceived to be a lack of "documentary evidence to support [M.Z. Berger's] allegation in the application of its claimed bona fide intent to use the mark in commerce as of the application filing date." J.A. 18. In addition, the Board faulted M.Z. Berger because it did not have evidence of "promotional" materials (J.A. 24), and there was "contradictory testimony regarding [M.Z. Berger's] effort to develop and market an IWATCH-brand watch" (J.A. 32).

As a result, the Board discounted much of M.Z. Berger's objective evidence of bona fide intent, including its more than sixty years in the

watch business (J.A. 31–32); its practice of designing, developing, and bringing to market proprietary brands under other trademarks (J.A. 30–31); the product-development meetings it held, where members of the company discussed the iWatch name (J.A. 1765–66, 1860–61, 1887), developed a logo with a lower case "i" and capital "W" (J.A. 1767, 2044), debated features of the watch (J.A. 1767, 1894), considered potential vendors and accounts (J.A. 1768), determined a target price point (J.A. 1769, 1814, 1862), and discussed potential colors (J.A. 1824–25); the renderings of possible products that the company might develop (J.A. 227–28); the trademark search it conducted before applying for the mark (J.A. 1251, 1966–67, 1987–2003); and the fact that the company had discussed the iWatch name with a potential buyer (*e.g.*, J.A. 1779)—all factors that the Board had deemed probative in previous cases of an applicant's bona fide intent to use a mark in commerce (*see, e.g.*, J.A. 23–24, 31–32).

After discounting all of M.Z. Berger's evidence, the Board ruled that the company had failed to demonstrate its bona fide intent under Section 1051(b). The Board thus sustained Swatch's opposition to

registration, thereby denying M.Z. Berger the right to register its iWatch mark.

5.     On November 26, 2013, M.Z. Berger filed a timely notice of appeal to this Court.  J.A. 2134.  Thereafter, on December 9, 2013, Swatch filed a notice of cross-appeal from "the portion of the . . . September 30, 2013 decision of the Trademark Trial and Appeal Board which finds there is no likelihood of confusion."  J.A. 2170.  This Court dismissed the cross-appeal as improvidently filed in an order entered on March 19, 2014.

## SUMMARY OF THE ARGUMENT

Section 1051(b) of Title 15 of the United State Code allows applicants to apply for and obtain priority in a trademark based on "a 'bona fide intention to use the mark in commerce' at a later date." *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357–58 (Fed. Cir. 2009) (quoting 15 U.S.C. § 1051(b)).  Congress added the intent-to-use application process through the Trademark Law and Revision Act of 1988, Pub. L. No. 100-667, 102 Stat. 3935 (1988) ("TLRA"), in order to correct perceived deficiencies in the then-existing trademark registration process.  In particular, Congress sought to lower financial

and administrative barriers for people and businesses who had a legitimate interest in bringing new products and services to market, while weeding out applicants who might abuse the trademark system by tying up marks they never intended to use.  Congress accomplished these dual objectives by allowing businesses to apply for and obtain priority in a trademark without having taken concrete steps to bring the mark to market, S. Rep. No. 100-515, at 23 (1988), while subjecting the applicants to an increasingly rigorous administrative review process after they receive a notice of allowance from the Patent and Trademark Office—in essence, an assurance that their mark is registrable.  *See Aycock Eng'g*, 560 F.3d at 1357–58 (discussing Section 1051(b)); *Eastman Kodak Co. v. Bell & Howell Document Mgmt. Prods. Co.*, 994 F.2d 1569, 1575 n.8 (Fed. Cir. 1993) (same).

M.Z. Berger submitted more than enough evidence to demonstrate its bona fide intent to use the iWatch mark in commerce under the TLRA and precedent of the Trademark Trial and Appeal Board.  The company has decades of experience in importing, manufacturing, and selling watches.  *See Wet Seal, Inc. v. FD Mgmt., Inc.*, No. 91157022, 2007 WL 458529, at *14 (Trademark Tr. & App. Bd. May 15, 2007)

(ruling that applicant's capacity to manufacture and market a relevant product class "tend[ed] to affirmatively rebut any claim by opposer regarding applicant's intent"). In the years before filing its application, it had brought numerous proprietary watches to market using many new trademarks, evidencing its ability to do so again in the future. In addition, the company had begun to assemble the building blocks for its new brand by holding internal meetings to discuss logistics of the iWatch line, and by conducting an extensive trademark clearance search to confirm the availability of the iWatch mark. In the months after M.Z. Berger filed the application, it created graphical renderings of watches bearing the iWatch logo and even discussed the iWatch brand with a potential buyer.

Yet, the Trademark Trial and Appeal Board held that the evidence marshalled by M.Z. Berger was legally insufficient to establish bona fide intent. In so doing, the Board rewrote Section 1051(b)'s intent-to-use standard in the middle of the opposition proceedings by requiring the company to prove that it had already undertaken efforts to promote, market, or develop a product bearing the iWatch mark at the time the company filed its initial intent-to-use application. And

beyond this, the Board systematically discounted nearly every piece of evidence produced by M.Z. Berger, viewing each piece in isolation rather than viewing the evidence as a whole.  J.A. 18–33.

Under the TLRA and the Patent and Trademark Office's own regulations, however, an applicant is not required to show efforts to bring a product bearing the trademark to market by showing efforts to promote, develop, or market that product until *after* the applicant receives a notice of allowance, 15 U.S.C. § 1051(d)(1), (2); 37 C.F.R. § 2.89(d), which the Patent and Trademark Office only issues at the conclusion of any opposition proceedings, *see* 15 U.S.C. § 1063(b)(2). Thus, the Board erred by requiring M.Z. Berger to show efforts to promote, develop, or market the iWatch mark at the time that the company filed its intent-to-use application, *before* the company had received a notice of allowance.

If left uncorrected, the flawed standards applied by the Board in its precedential decision will impose significant costs on businesses filing intent-to-use applications, thereby undermining the very purpose of the TLRA.  The Board's decision all but requires applicants to make risky financial investments in developing and marketing products

bearing the applied-for trademark *before* the applicant even learns whether the Patent and Trademark Office deems the applied-for mark registrable. Such an outcome conflicts with the text of Section 1051(b) and Congress's express intent to lower the financial barriers of entry for applicants seeking protection for new marks and brands.

Finally, although the Board erred in ruling that M.Z. Berger lacked bona intent to use the iWatch mark in commerce, the Board correctly found that there is no likelihood of confusion between the "iWatch" mark and the "Swatch" mark. The marks differ substantially in sound, appearance, and commercial impression.

This Court should, therefore, reverse in part the decision of the Trademark Trial and Appeal Board on the ground of lack of bona fide intent, and affirm in part on the ground of no likelihood of confusion, and remand with instructions to deny Swatch's opposition to registration of M.Z. Berger's iWatch mark and issue a notice of allowance.

## STANDARD OF REVIEW

Legal conclusions of the Board, "including its interpretations of the Lanham Act and the legal tests it applies in measuring

registrability, are reviewed *de novo.*" *In re Save Venice N.Y., Inc.*, 259 F.3d 1346, 1351–52 (Fed. Cir. 2001); *see also In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003).  Factual findings of the Trademark Trial and Appeal Board are reviewed to confirm that substantial evidence supports the Board's finding.  *In re Becton, Dickinson & Co.*, 675 F.3d 1368, 1373 (Fed. Cir. 2012).  And, consistent with these distinctions, this Court reviews *de novo* the Board's ultimate legal conclusion as to whether there is a lack of a bona fide intent or a likelihood of confusion. *Recot, Inc. v. M.C. Becton*, 214 F.3d 1322, 1327 (Fed. Cir. 2000).

## ARGUMENT

### I.   THE BOARD ERRED IN CONCLUDING THAT M.Z. BERGER LACKED A BONA FIDE INTENT TO USE THE iWATCH MARK IN COMMERCE.

During the proceedings before the Trademark Trial and Appeal Board, M.Z. Berger presented ample evidence to demonstrate its bona fide intention to use the iWatch mark.  This evidence included the company's sixty-year history in the watch business; its experience in manufacturing watches and clocks and bringing other trademarked brands to market; a trademark clearance search conducted by M.Z. Berger for "iWatch"; testimonial evidence regarding internal company meetings to discuss the logo, features, appearance, and pricing of the

iWatch brand; documentary and testimonial evidence regarding conversations with a prospective buyer of the iWatch brand; and renderings of watches bearing the iWatch mark.

Despite this ample evidence of bona fide intent, the Board sustained Swatch's opposition based on M.Z. Berger's purported lack of documentary evidence of "promotional" material or "effort[s] to develop and market an IWATCH-brand watch" at the time it filed its initial application.  J.A. 24, 32.  In the process, the Board placed a heightened burden upon M.Z. Berger—one that is inconsistent with both the TLRA and the Patent and Trademark Office's own regulations.  The decision of the Board should, therefore, be reversed as to Swatch's claim of a lack of bona fide intent.

### A.   The Standard Adopted by the Board is Inconsistent with the Trademark Law Revision Act of 1988.

As an initial matter, the standard adopted by the Board— insisting upon proof of actual promotion, development, and marketing— cannot be squared with the operative standard enacted by Congress through the Trademark Law Revision Act of 1988.  That Act made clear that a good-faith intent is all that is required.

### 1. 15 U.S.C. § 1051(b) Requires Only a Bona Fide Intent to Use, Not Actual Promotion, Development, and Marketing.

The plain text of Section 1051(b)(1) makes clear that an intent-to-use applicant need only have a *bona fide intention* to use the mark in commerce. Under the statute, "a person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce may request registration of its trademark on the principal register . . . ." 15 U.S.C. § 1051(b)(1). In order to demonstrate a bona fide intent to use the mark at a later date, the application must include a verified statement specifying "the applicant's bona fide intention to use the mark in commerce." *Id.* § 1051(b)(3)(B).

Critically, nothing in the statute requires the applicant to demonstrate actual use of the mark in commerce or measurable steps to bring the mark to the marketplace in order to file a successful intent-to-use application. Indeed, this Court has recognized that Section 1051(b) makes it possible for an applicant to "begin the registration process even when his mark [is] not in use in commerce at the time of the filing, so long as he [has] a 'bona fide intention to use the mark in commerce' at a later date." *Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350,

1357–58 (Fed. Cir. 2009) (quoting 15 U.S.C. § 1051(b)); *see also Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 357 (6th Cir. 1998) ("[T]he Lanham Act now allows applicants to apply for registration of a mark . . . years before it is actually used in commerce."); *see also* 15 U.S.C. § 1051(d)(1), (2) (allowing up to three years from when the applicant learns from the Patent and Trademark Office that its mark is registrable to prove actual use of the mark in commerce).

### 2. Congress Envisioned a Low Standard for Demonstrating an Applicant's Bona Fide Intent to Use.

When Congress passed the Trademark Law Revision Act of 1988, Pub. L. No. 100-667, 102 Stat. 3935 (1988), it created an intent-to-use application process that lowered barriers for applicants who wanted to secure a legitimate interest in a new trademark while guarding against persons who might abuse the trademark system. In passing the TLRA, Congress made clear that the intent-to-use application and registration process would realize these dual objectives by: (1) allowing applicants to apply for and secure priority in a trademark without taking measurable steps to develop, or make significant financial investments in, their

products; and (2) ensuring that the administrative review process contained adequate safeguards to weed out applicants who merely wanted to reserve an interest in a trademark, but lacked any real intent to ultimately use the mark in commerce.

The Senate Report accompanying the TLRA explained that the application process lowered the barriers to entry by allowing an applicant to file an intent-to-use application "without having taken concrete steps to create and introduce a new product, provided that in fact it intends to use the mark." S. Rep. No. 100-515, at 23 (1988). The House of Representatives further elaborated upon the need to change the law to allow persons and businesses to file a trademark application without having actually used the mark in commerce, citing the need for flexibility in the application process:

> [I]t may be impossible to make use of a mark before a business makes a significant financial investment in the goods or services to which the mark will apply. To require the applicant to make that investment before it can seek protection of its mark works to the applicant's serious disadvantage.

H.R. Rep. No. 100-1029, at 8 (1988). Similarly, the Senate criticized the pre-TLRA application and registration system, because it offered "no assurance that[,] after selecting and adopting a mark, and possibly

making a sizable investment in packaging, advertising and marketing," the trademark would clear the application process. S. Rep. No. 100-515, at 5. Congress, therefore, endorsed a legislative fix that allowed applicants to begin the registration process without making expensive and risky investments to bring a trademark to market. *See* S. Rep. No. 100-515, at 5–6 (observing that, in 1988, "[m]arketing a new product domestically often exceeds $30 million for a large company and can consume the life-savings of an individual or small entrepreneur"); *see also* H.R. Rep. No. 100-1029, at 8.

At the same time, Congress recognized that the intent-to-use application process was susceptible to abuse by less scrupulous businesses. The Senate cautioned that "[a] single business or individual might . . . attempt to monopolize a vast number of potential marks on the basis o[f] a mere statement of intent to use the marks in the future." S. Rep. No. 100-515, at 6. The Senate was, therefore, "particularly concerned that the legislation contain sufficient safeguards against potential abuse." *Id*. at 24. Congress addressed this risk by imposing the bona-fide intent requirement of Section 1051(b), and the escalating proof requirement embodied in Section 1051(d).

As Congress explained, the "bona fide [intent] requirement focuses on an objective good-faith test to establish that the intent is genuine." S. Rep. No. 100-515, at 6. Thus, "[t]he use of the term 'bona fide' is meant . . . to require, based on an objective view of the circumstances, a good faith intention to *eventually* use the mark in a real and legitimate commercial sense." H.R. Rep. No. 100-1028, at 9 (emphasis added).

Congress also built a layered administrative review process in which the applicant must undergo multiple stages of examination and eventually demonstrate actual use of the mark in commerce before the Patent and Trademark Office will register the mark on the Principal Register. *See, e.g.*, 15 U.S.C. § 1051(d); *see also infra* I.B. (discussing the Patent and Trademark Office's regulations implementing the layered-review process). This Court has observed that these multiple stages of administrative review make it unlikely that an applicant would be able to abuse the trademark registration system to tie up a trademark that it has no bona fide intent to use. *Eastman Kodak Co. v. Bell & Howell Document Mgmt. Prods. Co.*, 994 F.2d 1569, 1575 n.8 (Fed. Cir. 1993) ("[I]n order for an applicant to tie up . . . marks for a period of months or years, the applicant would have to mislead the PTO

through several stages of the process—an unlikely event and one with potentially severe consequences for the applicant."); *see also* H.R. Rep. No. 100-1028, at 9 (noting that the potential for tying up a mark in an intent-to-use application is limited by features of the review process).

### 3. The Objective Evidence Demonstrates That M.Z. Berger Has a Bona Fide Intent to Use the iWatch Mark in Commerce.

During the proceedings in the Trademark Trial and Appeal Board, M.Z. Berger produced evidence that was more than sufficient to demonstrate its bona fide intent to use the iWatch trademark in commerce. Indeed, the undisputed evidence established that M.Z. Berger is a company that has been in the watch business since 1952. J.A. 1245. The company has brought numerous trademarked watches to market, both in the years preceding the iWatch application (J.A. 1233–34) and in the years after it submitted the iWatch application (J.A. 1224–25, 1227–28, 1230–31). Other evidence showed that M.Z. Berger had begun to lay the ground work for an iWatch-branded watch. For example, prior to filing its intent-to-use application for the iWatch mark, M.Z. Berger conducted an extensive trademark clearance search. J.A. 1251, 1966–67, 1987–2003. Testimony by company employees

established that the company held several meetings about aspects of the iWatch brand, including logo design and available technology (J.A. 1767); product pricing (J.A. 1769); and product features (J.A. 1812). In the months following the submission of the intent-to-use application, M.Z. Berger's creative director prepared multiple renderings of iWatch-branded watches. J.A. 754–58.

In addition, an internal email indicated that the company had given a prospective buyer a copy of these renderings and discussed the pricing of interactive features of an iWatch-branded watch. J.A. 2033. The Board found the evidence of this communication of the renderings to be unconvincing and contradicted by the testimony of the company's CEO. J.A. 29. Though, in fairness, the CEO appeared to simply express confusion about whether the renderings were shown to a prospective buyer, *see* J.A. 855–56 (using the qualifiers "[p]ossibly," "probably," "maybe," "I don't know," "I don't think so," "it appears," and "I think"), and was deposed at a time when M.Z. Berger's bona fide intent was not at issue in the proceedings, *see* J.A. 125–27. In the end, however, this Court need not resolve whether substantial evidence supports this finding, because even if the renderings were not shared

with a buyer, they still evince efforts by the company to create a style and image for the iWatch brand line, and the other evidence was more than sufficient to demonstrate M.Z. Berger's bona fide intent to eventually use the mark in commerce under 15 U.S.C. § 1051(b)(1).

M.Z. Berger's sixty years of experience in the watch business, and its success in manufacturing and bringing watches to market, including watches under its own new trademarks, are objective facts that tend to "affirmatively rebut any claim by [Swatch] regarding [M.Z. Berger's] intent." *Wet Seal*, 2007 WL 458529, at *14; *see also Loreal S.A. v. Marcon*, 102 U.S.P.Q.2d 1434, 2012 WL 1434, at *12 (Trademark Tr. & App. Bd. Mar. 20, 2012) (highlighting importance of an applicant's history of producing similar products). In addition, the company was able to point to steps it took to conceive of and develop the iWatch brand, all of which are objective facts that supplement the company's statement of intent to use the iWatch mark in commerce under both the TLRA and Board precedent. *See* S. Rep. No. 100-515, at 23 ("Bona fide intent is measured by objective factors. A statement of intent to use a mark on specifically identified products in the future may be sufficient."); *Loreal S.A.*, 2012 WL 1434, at *12 (Trademark Tr. & App.

Bd. Mar. 20, 2012) (highlighting probative value of graphic design efforts and correspondence with prospective buyers); *Speedway Superamerica LLC v. Renegade Tobacco Inc.*, No. 91124822, 2004 WL 2075108, at *7 (Trademark Tr. & App. Bd. Sept. 2, 2004) (holding that trademark clearance search by applicant was probative of applicant's bona fide intent).

M.Z. Berger, therefore, produced more than sufficient testimonial and documentary evidence to substantiate its "'bona fide intention to use the [iWatch] mark in commerce' at a later date." *Aycock Eng'g*, 560 F.3d at 1357–58. That is all that is required under 15 U.S.C. § 1051(b)(1).

> **4. In Holding That M.Z. Berger Lacked the Requisite Intent, the Board Ignored Objective Evidence in Violation of Its Own Precedent and the Low Standard Established by Section 1051(b).**

Despite the evidence amassed by M.Z. Berger during the proceedings below, the Board claimed that the company had only produced a "paucity" of evidence. J.A. 30. But the Board arrived at this conclusion only after it had erroneously discounted the legal sufficiency of the majority of the testimonial and documentary evidence that M.Z.

Berger had marshalled in its defense. Perhaps most troubling, the Board repeatedly acknowledged that the individual pieces of evidence produced by M.Z. Berger would have carried weight in defending its bona fide intent under prior Board rulings. *See* J.A. 23–25, 29, 31–32.

The Board reached its conclusion in large part because it insisted upon evidence that M.Z. Berger had taken steps to promote, develop, and market the iWatch mark at the time that it filed its original application. *See* J.A. 24, 32. In addition, the Board favored documentary evidence over any other form of evidence demonstrating M.Z. Berger's bona fide intent. *See, e.g.*, J.A. 18–24.

By separately evaluating and discounting most of the evidence produced by M.Z. Berger for these misguided reasons, the Board missed the forest for the trees. The Board paid virtually no heed to the fact that the applicant in this case is a company that has been in the watch business for more than sixty years and has successfully brought watches to market under its own trademarks. Moreover, it failed to appreciate that M.Z. Berger had in fact managed to produce pages of documentary evidence and testimony establishing its bona fide intent to use the iWatch mark in commerce. The Board's flawed legal theories,

coupled with its failure to consider the totality of the evidence, led it to conclude that Swatch had succeeded in making a prima facie case that M.Z. Berger lacked a bona fide intent to use the iWatch mark in commerce.[2]

Indeed, the Board increasingly strayed from its own precedent and the mandate of Section 1051(b) as it systematically rejected the legal sufficiency of the evidence produced by M.Z. Berger. The Board first rejected the sufficiency of M.Z. Berger's trademark clearance search because it deemed the company's other evidence of bona fide intent insufficient. J.A. 24–25 (citing *Research in Motion Ltd. v. NBOR Corp.*, 92 U.S.P.Q.2d 1926, 2009 WL 4694941, at *5 (Trademark Tr. & App. Bd. Dec. 2, 2009)).

The Board also ruled that M.Z. Berger's renderings of iWatch-branded watches were legally insufficient to prove bona fide intent because they had not been used for "*any promotional or other purpose.*"

---

[2] Although the Board commented on the "*paucity* of documentary evidence," the Board at times recognized that M.Z. Berger *did*, in fact, produce "documentary evidence of record." J.A. 26 n.73. This is reason enough for this Court to rule that Swatch failed to make a prima facie case under the Board's own precedent by failing to demonstrate the absence of *any* documentary evidence. *See Honda Motor Co. v. Winkelman*, 90 U.S.P.Q.2d 1660, 2009 WL 962810, at *2 (Trademark Tr. & App. Bd. Apr. 8, 2009).

J.A. 24 (emphasis added). The Board believed that, in order to demonstrate bona fide intent under Section 1051(b), the evidence had to show that the company had taken steps to promote, develop, or market an iWatch-branded watch. *See id.*

A similar rationale prompted the Board to reject the sufficiency of M.Z. Berger's demonstrated capacity to produce the goods identified in the application. Although the Board acknowledged that M.Z. Berger had "long been in the business of making and selling watches and clocks," J.A. 31, it discounted the significance of the company's extensive experience based on a perceived uncertainty in the record surrounding M.Z. Berger's "effort to *develop* and *market* an IWATCH-brand watch." J.A. 32 (emphasis added). It was legal error for the Board to hold M.Z. Berger to such a standard.

In addition, the Board rejected the relevance of M.Z. Berger's experience in bringing other trademarked watch brands to market without considering the full record before it. To be sure, the Board rejected the relevance of the watch brands I-KIDZ and iMove because M.Z. Berger created those brands years after it submitted its intent-to-use application for iWatch. J.A. 30–31. But the company submitted

evidence that it had brought other trademarked watches to market in the years *before* it submitted its intent-to-use application for the iWatch mark. *See* J.A. 1233–34 ("Sache"); J.A. 1242–43 ("Studio Time"). The Board never discussed this evidence. *See* J.A. 30–31.

Finally, the Board dedicated much space to discussing whether M.Z. Berger had formulated a specific intent to use in commerce an iWatch-brand watch that included a technological feature (*see* J.A. 27–30), even though that issue had only marginal bearing on whether M.Z. Berger had a bona fide intent to use the iWatch mark in commerce, and even though there was evidence that the company was prepared to bring to market a watch without any technological feature (*see* J.A. 76, 1894, 2033). Moreover, the Board acknowledged, albeit later in a footnote, that the very purpose of the intent-to-use application process was to allow an applicant to file an "'original application without having taken concrete steps to create and introduce the new product.'" J.A. 31 (citing S. Rep. No. 100-515, at 23).

The Board's misplaced emphasis on evidence of promotion, development, and marketing undermines the requirements of the intent-to-use application process envisioned by Congress. Although the

Board has previously deemed an applicant's steps to promote, develop, and market a trademarked product to be sufficient *indicia* of bona fide intent under Section 1051(b), *see, e.g.*, *Loreal S.A.*, 2012 WL 1434, at *12, it has never ruled that such steps are *required* to demonstrate such an intent.  *See* Sandra Edelman, *Proving Your Bona Fides— Establishing Bona Fide Intent to Use Under the U.S. Trademark (Lanham) Act*, 99 Trademark Rep. 763, 781 (2009) (identifying grounds that have been deemed sufficient by the Board to establish bona fide intent).  Moreover, although courts have explained that something more than a mere statement of subjective intent is required under Section 1051(b), *see, e.g.*, *Adver. to Women, Inc. v. Gianni Versace S.p.A.*, No. 98 C 1553, 2000 WL 1230461, at *4 (N.D. Ill. Aug. 24, 2000), the statute's text and legislative history make clear that an applicant need not take concrete steps to promote, develop, or market a trademark in order to file a successful intent-to-use application.  S. Rep. No. 100-515, at 23.  Thus, by refusing to find bona fide intent based upon M.Z. Berger's failure to promote, develop, or market the iWatch-branded watch, the Board applied a heightened standard unsupported by the text or

purpose of Section 1051(b). The decision of the Board should be reversed on this ground alone.

## B. The Standard Adopted by the Board Conflicts with the Statutorily-Mandated Administrative Review Process and with the Patent and Trademark Office's Own Regulations.

The Board's emphasis on promotion, development, and marketing is not simply inconsistent with the text and purpose of Section 1051(b); it also conflicts with the application and registration steps outlined in the statutorily-mandated administrative review process, as well as the Patent and Trademark Office's own regulations.

As this Court has recognized, Congress crafted an intent-to-use application and registration process that, standing alone, achieves the proper balance between lowering the barriers to entry for applicants with a bona fide intent to use a mark in commerce, and weeding out those applicants who ultimately lack that intent. *Eastman Kodak Co.*, 994 F.2d at 1575 n.8. The administrative review process imposes escalating burdens on trademark applicants to demonstrate their intent to use the mark in commerce, eventually requiring applicants to demonstrate actual use of the mark, or efforts to promote, market, or develop the mark in commerce. *See* 15 U.S.C. § 1051(d)(1), (2). But

these weighty burdens only attach at later stages in the process, after the conclusion of opposition proceedings and the issuance to the applicant of a notice of allowance. *See id.* §§ 1051(d)(2), 1063(b)(2). This, in turn, confirms that applicants in the early stages of the application and registration process, including applicants ensnared in opposition proceedings, should not be required to demonstrate concrete steps to promote, market, or develop the mark.

## 1. The Application and Registration Process Does Not Require Proof of Actual Use Until Later in the Process.

An applicant alleging a bona fide intent to use a mark in commerce first files an application with the Patent and Trademark Office. 15 U.S.C. § 1051(b). If the mark appears registrable, the Office publishes it for opposition, *id.* § 1062(a), at which point an opposer may file a notice of opposition with the Trademark Trial and Appeal Board, *id.* § 1063(a); 37 C.F.R. § 2.101. If no opposer is successful, then the Patent and Trademark Office will issue a notice of allowance to the applicant. 15 U.S.C. § 1063(b)(2). At this point, the applicant has six months to file a statement with the Office verifying that the trademark is being used in commerce. *Id.* § 1051(d)(1).

If the applicant is not prepared to file a verified statement of use within six months of receiving the notice of allowance, the applicant may request one automatic six-month extension by paying a fee and filing "a verified statement that the applicant has a continued bona fide intention to use the mark in commerce." 15 U.S.C. § 1051(d)(2); 37 C.F.R. § 2.89(a)(2). The applicant is not required to produce any evidence to qualify for this extension. *See* 15 U.S.C. § 1051(d)(2) (stating that the applicant "shall" receive an extension); *see also* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 19:13 (4th ed. 2004) (noting that the first six-month extension is "automatically available upon request" to the Patent and Trademark Office). The applicant may then request four additional six-month extensions by paying a fee and showing "good cause" for each additional extension. 15 U.S.C. § 1051(d)(2); 37 C.F.R. § 2.89(b). Thus, after accounting for all extensions, an applicant may have up to 36 months after receiving a notice of allowance in which to file a verified statement of use. *See* 15 U.S.C. § 1051(d)(1), (2).

Under the Patent and Trademark Office's regulations, to guard against abuse, the showing of "good cause" that must accompany each

requested extension after the first one must include a description of the concrete steps the applicant has taken to bring the trademarked product or service to market. 37 C.F.R. § 2.89(d). Only at these later stages of the application process, when it is expected that the applicant will have made strides towards bringing the applied-for mark to market, is it appropriate to require a showing of "product or service research or development, market research, manufacturing activities, promotional activities, steps to acquire distributors, steps to obtain governmental approval, or other similar activities." *Id.* That, however, is not the stage in the process at which M.Z. Berger found itself when confronted with Swatch's opposition.

It is important to note that under the statute and regulations the notice of allowance marks the point at which the applicant must begin to take steps to bring the trademarked product to market. And the notice of allowance only issues *after* the applicant survives an opposition proceeding. 15 U.S.C. § 1063(b)(2). After receiving the notice of allowance, the applicant effectively has one year (which includes the automatic, six-month extension) in which to verify actual use, 15 U.S.C. § 1051(d)(1), or show good cause (*i.e.*, concrete steps to

promote, market, develop, or manufacture the product) if additional
extensions are necessary, *id.* § 1051(d)(2); 37 C.F.R. § 2.89(d). Given
that these more stringent burdens only attach at the later stages of the
application process—one year *after* the applicant receives a notice of
allowance—it would make no sense if these same stringent burdens
were deemed to attach at the *initial* stages of the application process—
*before* the applicant even receives a notice of allowance. *See* 15 U.S.C.
§ 1063(b)(2).

> **2.    The Board Departed from the Statute and the
> Patent and Trademark Office's Own Regulations
> When It Required M.Z. Berger to Produce
> Evidence of Promotion, Development, or
> Marketing Activities Before Receiving the Notice
> of Allowance.**

By rejecting M.Z. Berger's evidence for failing to demonstrate
promotional, developmental, or marketing efforts, the Board applied an
evidentiary standard that conflicts with the application and registration
steps codified in the Trademark Law Revision Act and the Patent and
Trademark Office's own regulations. As demonstrated above, the Board
repeatedly rejected the evidence that M.Z. Berger had marshalled
during the opposition proceedings because it failed to demonstrate that
the company had taken any "*promotional*" steps, J.A. 24, or had made

"an effort to *develop* and *market* an IWATCH-brand watch," J.A. 32 (emphasis added). But this standard mirrors the production burden that attaches to an applicant's second request for a six-month extension to file a verified statement of use. *See* 37 C.F.R. § 2.89(d) (applicants seeking a second six-month extension must show "good cause" by demonstrating "product or service research or *development, market research*, manufacturing activities, *promotional activities*, steps to acquire distributors, steps to obtain governmental approval, *or other similar activities*." (emphasis added)).

Under the statutes and regulations, this burden of production should not fall on the shoulders of M.Z. Berger until *after* it has received a notice of allowance, which the Patent and Trademark Office will not issue until *after* the conclusion of the current opposition proceedings. *See* 15 U.S.C. §§ 1051(d), 1063(b)(2). M.Z. Berger is, therefore, not obligated under the TLRA and accompanying regulations to demonstrate at this early stage of the application process concrete steps to promote, develop, or market iWatch-branded watches. The Board's decision should be reversed for this reason as well.

**C.    The Standard Adopted by the Board Requires Businesses to Engage in Unnecessary and Expensive Brand-Building Efforts Before Applying for a Trademark.**

The standard adopted by the Board will have practical implications that affect businesses other than M.Z. Berger.  The first stages of the application process have been viewed by practitioners to be a matter of "compliance with formalities and registrability."  McCarthy, *supra* § 19:13.  As a result, lawyers have encouraged applicants to produce only some documentation to demonstrate their bona fide intent under Section 1051(b), including written plans of action, a demonstrable capacity to market the trademarked product, *see id.* § 19:14; Edelman, *supra*, at 773–74, 781, or trademark clearance searches for the applied-for mark, *see* Edelman, *supra*, at 781.

And yet, if the Board's opinion is allowed to stand, then lawyers and their clients will have to reconsider this approach.  Applicants will need to take concrete steps to promote, develop, or market the trademark prior to submitting the intent-to-use application, and this, in turn, will require applicants to expend considerable resources developing and marketing a brand before they receive any assurance from the Patent and Trademark Office that their mark is registrable.

For smaller, family-owned businesses like M.Z. Berger, this will require risky financial investments in a brand and trademark that may never earn administrative approval.

Such an outcome would fly in the face of legislative intent. In passing the Trademark Law Revision Act, Congress made clear that an applicant should not be required to make "a significant financial investment in the good or services to which the mark will apply . . . . before it can seek protection of its mark." H.R. Rep. No. 100-1028, at 8; *see also* S. Rep. No. 100-515, at 5–6 (noting that the intent-to-use system would protect a business from the costly process of marketing a product before it qualifies for trademark protection). The evidentiary standard articulated and applied by the Board in this proceeding effectively reintroduces the costly barriers to trademark protection that Congress sought to eliminate by passing the TLRA.

## II.    The Board Correctly Found That There Is No Likelihood of Confusion Between the iWatch and Swatch Marks.

The Board correctly concluded that there is no likelihood of confusion between M.Z. Berger's "iWatch" mark and the "Swatch" mark; those marks differ in appearance, sound, meaning, and consumer impression.

To determine whether a likelihood of confusion exists, this Court looks to the multi-factor test set forth in *Application of E. I. DuPont DeNemours & Co.*, 476 F.2d 1357 (C.C.P.A. 1973). *See Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1370 (Fed. Cir. 2002). The *DuPont* test includes thirteen factors that help a fact-finder evaluate the similarity or dissimilarity of the marks, brand dilution of famous trademarks, and the likelihood that consumers would confuse the two marks. *See DuPont*, 476 F.2d at 1361. As with a lack of bona fide intent, this Court reviews evidentiary findings as to the individual factors for substantial evidence, whereas the "ultimate question of whether a likelihood of confusion exists is . . . a question of law[—]an issue upon which [the Court] appl[ies] plenary review." *Bose Corp.*, 293 F.3d at 1370.

The Board correctly ruled that there is no likelihood of confusion based on two principal findings. First, "watch" is a descriptive and generic term, J.A. 13–14, which "may be given little weight in reaching a conclusion on likelihood of confusion." *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 947 (Fed. Cir. 2000) (quotation marks omitted). Thus, the Board correctly concluded that the mere fact that M.Z. Berger

used the term "Watch" in its "iWatch" mark is not a basis for finding a likelihood of confusion.

Second, the Board correctly determined that "iWatch" and "Swatch" differ in "sound, meaning, and overall commercial impression." J.A. 14. As the Board explained, "iWatch" is a two-syllable word beginning with a long vowel, making the "eye" sound, whereas "SWATCH" is a mono-syllabic term, beginning with a "sibilant consonant." *Id.* Moreover, the "i" of "iWatch" could lend itself to "a number of different consumer interpretations," such as interactive features, or a personal pronoun, whereas "Swatch" has none of these meanings. J.A. 15. These differences are more than adequate evidentiary support for the Board's finding that there is no likelihood of confusion between the two marks.

# CONCLUSION

For the foregoing reasons, this Court should (i) reverse that portion of the decision of the Trademark Trial and Appeal Board based on M.Z. Berger & Co.'s perceived lack of a bona fide intent to use the iWatch mark in commerce; (ii) affirm that portion of the decision finding no likelihood of confusion; and (iii) remand with instructions that the Patent and Trademark Office deny Swatch's opposition and issue a notice of allowance.

Dated:  May 2, 2014                            Respectfully submitted,


                                                /s/ Howard R. Rubin
Samson Helfgott                                 Howard R. Rubin
Jessica Garrett                                    *Counsel of Record*
KATTEN MUCHIN ROSENMAN LLP                      Robert T. Smith
575 Madison Avenue                              Daniel Lipton*
New York, NY  10022                             KATTEN MUCHIN ROSENMAN LLP
212-940-8800                                    2900 K Street, NW
                                                Suite 200 – North Tower
                                                Washington, DC  20007-5118
                                                Tel:  202-625-3500

                                                *Counsel for Appellant*
                                                *M.Z. Berger & Co., Inc.*

---

* Admitted to practice before the Federal Circuit; licensed to practice in New York only; supervised by Principals of the Firm who are members of the District of Columbia Bar consistent with D.C. Bar Rule 49(c)(8).

CASE PARTICIPANTS ONLY

## ADDENDUM – OPINION OF BOARD

THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:                                          Mailed:
March 12, 2013                                    September 30, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*Swatch AG (Swatch SA) (Swatch Ltd.)*[1]
*v.*
*M. Z. Berger & Co., Inc.*
_____

Opposition No. 91187092
Application Serial No. 77222620
_____

Jeffrey A. Lindenbaum and Jess M. Collen of Collen IP for Opposer.

Michael F. Sarney of Katten Muchin Rosenman LLP for Applicant.
_____

Before Seeherman, Kuczma, and Hightower, Administrative Trademark Judges.

Opinion by Hightower, Administrative Trademark Judge:

On July 9, 2007, applicant M. Z. Berger & Co., Inc. applied to register the

mark IWATCH, in standard character form, for the following goods:

> Cases for clock and watch-making; Cases for watches and
> clocks; Clock and watch hands; Dials for clock-and-watch-
> making; Diving watches; Jewelry watches; Parts for
> watches; Pocket watches; Stop watches; Watch bands;
> Watch bands and straps; Watch boxes; Watch bracelets;

---

[1] Opposer is a Swiss corporation. The parentheticals are part of its name.

A. 1

Opposition No. 91187092

> Watch cases; Watch chains; Watch clasps; Watch crowns;
> Watch faces; Watch fobs; Watch parts; Watch straps made
> of metal or leather or plastic; Watches; Watches
> containing a game function; Wrist watches; Alarm clocks;
> Clock dials; Clocks; Pendulum clocks; Small clocks; Table
> clocks; Wall clocks

all in International Class 14.[2]

Opposer Swatch AG (Swatch SA) (Swatch Ltd.) opposes the application on the grounds of likelihood of confusion with its registered marks SWATCH and SWATCH in stylized form, as detailed *infra*, and lack of bona fide intent to use the mark in commerce.[3] The proceeding is fully briefed, and an oral hearing was held before the Board on March 12, 2013.

<u>Evidentiary Issues</u>

Applicant moves to strike from evidence an article from the magazine *Women's Wear Daily* introduced by opposer as Exhibit 19 to the Higgins Transcript[4] and also submitted as Exhibit 39 to opposer's notice of reliance. The article is titled "The WWD 100: A Women's Wear Daily Special Report, July 2008" and subtitled "The 11th annual consumer brand-awareness survey." The article explains that it includes the results of a survey conducted as follows:

---

[2] Application Serial No. 77222620, based on Trademark Act Section 1(b) (intent-to-use).

[3] We deem waived the additional grounds for opposition that opposer pled but did not argue in its brief. *See, e.g.*, *Knight Textile Corp. v. Jones Inv. Co.*, 75 USPQ2d 1313, 1314 n.4 (TTAB 2005). We also note that the Board denied opposer's motion to amend its pleadings to add claims of mere descriptiveness and/or deceptive misdescriptiveness, and the Commissioner for Trademarks, by delegation of the Director of the United States Patent and Trademark Office, denied opposer's petition to reverse that denial. *See* Commissioner for Trademarks Decision, August 11, 2011; Board Order of August 15, 2011.

[4] Patricia Higgins is brand manager for Swatch Group (U.S.) Inc., opposer's U.S. distributor.

Opposition No. 91187092

> To assess Americans' awareness of apparel and accessories brands, WWD commissioned Synovate, a New York-based market research firm. Synovate conducted an online poll of women between the ages of 13 and 64, with minimum household incomes of $35,000. The survey yielded 2,218 responses, including 247 teens age 13 to 17, and was fielded May 1 to 9.

> The questionnaire contained 1,054 prelisted brands in 12 categories, like denim, designer, accessories, innerwear, sportswear, etc. Women were asked to say whether they were "very familiar," "somewhat familiar" or "not at all familiar" with each brand. The results are a straightforward ranking of brands with the highest number of "very familiar" responses. …

> The results are accurate at the 95 percent confidence level and nationally projectable based on U.S. census data.[5]

In pertinent part, Opposer's SWATCH brand was listed 63rd overall[6] and fifth among watch brands.[7]

Applicant objects that the article lacks foundation and is hearsay because it reports a survey not conducted by Ms. Higgins, who is a fact witness, not an expert. Opposer acknowledges that the article was not submitted through an expert, but argues that it should be considered for what it shows on its face and not the truth of the matters asserted, like other "non-survey magazine and newspaper articles."[8]

We agree with opposer. Periodicals are considered self-authenticating pursuant to FED. R. EVID. 902(6) and may be admitted via notice of reliance

---

[5] Exhibit 19 to the Higgins Tr. and Exhibit 39 to Opposer's Notice of Reliance, at 001802.

[6] Id. at 001820.

[7] Id. at 001840. The watch brands were ranked, in order from 1 to 10, as Timex; Seiko; Fossil; Rolex; Swatch; Victorinox Swiss Army; Tiffany; Citizen; Casio; and Bulova.

[8] Opposer's opposition to applicant's motion to strike, at 1.

Opposition No. 91187092

pursuant to Section 2.122(e) of the Trademark Rules, 37 C.F.R. § 2.122(e). The article's significance lies in showing on its face that opposer's SWATCH mark is sufficiently well-known to be among the brands included. We therefore admit Exhibit 19 as a magazine article displaying evidence of the strength of the brand SWATCH (among many other such articles submitted by opposer), rather than as a scientific survey or other expert evidence.

Opposer, in turn, objects to applicant's offer in evidence of portions of the discovery depositions of applicant's own witnesses Bernard Mermelstein, owner/chief executive officer and corporate representative of applicant pursuant to FED. R. CIV. P. 30(b)(6), and Monica Titera, applicant's licensing and business affairs manager.[9] Applicant proffers the excerpts to complete the portions of those discovery depositions introduced by opposer.[10]

Trademark Rule 2.120(j)(4) states:

> If only part of a discovery deposition is submitted and made part of the record by a party, an adverse party may introduce under a notice of reliance any other part of the deposition which should in fairness be considered so as to make not misleading what was offered by the submitting party. A notice of reliance filed by an adverse party must be supported by a written statement explaining why the adverse party needs to rely upon each additional part listed in the adverse party's notice, failing which the Board, in its discretion, may refuse to consider the additional parts.

---

[9] Applicant's Notice of Reliance, Exhibits 8 and 9.

[10] Opposer's Notice of Reliance, Exhibits 17-26 (including testimony and exhibits).

A. 4

Considering first the Mermelstein testimony, which was filed under seal, we sustain opposer's objection as to pages 19:12-25 and 27:8-28:9, which introduce new testimony rather than make the excerpts offered by opposer not misleading. We overrule opposer's objection to the testimony at page 27:4-7, which clarifies the witness's preceding answer regarding store classification.

Turning to the Titera discovery deposition testimony, we overrule opposer's objection to page 41:8-23, in which the witness states that she received information verbally. Without this passage, the portion opposer introduced (pages 41:23-43:7) referencing documentation of the information may be misleading. Finally, we sustain opposer's objection to the introduction by applicant of pages 56:22-57:23 as it does not clarify or correct the testimony offered by opposer and therefore have not considered this passage.

We hasten to add, however, that consideration of the excluded testimony would not have affected the outcome herein.

Opposer also objects to the introduction by applicant of Registration No. 1613715 on the ground that it has been canceled. Opposer apparently is mistakenly referring to third-party Registration No. 1613735 for the mark EYEWATCH for "watches,"[11] which Office electronic database records reflect as a live registration. We therefore overrule opposer's objection. Applicant neither responded to opposer's motion with respect to this registration nor relied on the

---

[11] Applicant's Notice of Reliance, Exhibit 13.

Opposition No. 91187092

registration in its trial brief, and we note once again that this evidence does not affect the outcome herein.

<u>The Record</u>

The evidence of record automatically includes the pleadings, the file of the subject registration, and transcripts of the following testimony depositions,[12] with exhibits:

- Patricia Higgins, brand manager for Swatch (U.S.) ("Higgins Tr.");

- Monica Titera ("Titera Tr.");

- Brenda Russo, applicant's vice president of merchandising ("Russo Tr.");

- Marci Gordon, applicant's chief merchant and marketing officer ("Gordon Tr."); and

- Steven Kuritzky, applicant's vice president of business affairs and in-house counsel ("Kuritzky Tr.").

By submitting with its amended notice of opposition current printouts from the electronic database records of the U.S. Patent and Trademark Office showing the status and title of its pleaded registrations, pursuant to Trademark Rule § 2.122(d)(2), opposer made those registrations of record, as follows:

- SWATCH (in standard character form) for "watches, clocks and parts thereof"[13] and "jewelry, namely, earrings, necklaces, pendants, bracelet and rings";[14] and

---

[12] The parties' stipulation as to the filing and sealing of testimony deposition transcripts is hereby granted.

[13] Registration No. 1671076.

[14] Registration No. 2752980.

Case: 14-1219 CASE PARTICIPANTS ONLY Document: 24 Page: 64 Filed: 05/02/2014
Case: 14-1219 Document: 23 Page: 64 Filed: 05/08/2014

Opposition No. 91187092

- swatch (stylized) for "watches and parts thereof"[15] and "retail store services; namely, retail shops featuring watches, watch parts and watch accessories."[16]

Opposer also made the following evidence of record by notice of reliance:

- Opposer's Registrations:

  - No. 3554475, *eSwatch* for "Precious metals and their alloys, namely, white gold, yellow gold, pink gold, jewelry watches, precious stones, namely, diamond, sapphire, ruby, emerald, horological and chronometric instruments, namely, watch cases, chronographs, chronometers for use as watches, watches, watch movements" in International Class 14; "Retail store services in the field of horlogical [sic] instruments and jewellery, on-line retail store services in the field of horlogical [sic] instruments and jewellery" in International Class 35; and "Repair and maintenance of horological products and jewellery" in International Class 37. A request for extension of protection was filed on April 7, 2008 pursuant to Section 66A of the Trademark Act and the registration issued December 30, 2008.[17]

  - No. 3567953, *iSwatch* for "Precious metals and their alloys, namely, white gold, yellow gold, pink gold, jewelry watches, precious stones, namely, diamond, sapphire, ruby, emerald, horological and chronometric instruments, namely, watch cases, chronographs, chronometers for use as watches, watches, watch movements" in International Class 14; "Retail store services in the field of horological instruments and jewellery, on-line retail store services in the field of horological instruments and jewellery" in International Class 35; and "Repair and maintenance of horological products and jewellery" in International Class 37. A request for extension of protection was filed on April 7, 2008 pursuant to Section 66A of the Trademark Act and the registration issued January 27, 2009.[18]

---

[15] Registration No. 1356512.

[16] Registration No. 1799862.

[17] Opposer's Notice of Reliance, Exhibit 5.

[18] *Id.*, Exhibit 6. Opposer made no arguments in its briefs concerning the *eSwatch* and *iSwatch* marks.

Opposition No. 91187092

- Portions of applicant's responses to opposer's first and second sets of interrogatories and requests for admission;[19]

- Portions of the discovery depositions of applicant's witnesses Bernard Mermelstein ("Mermelstein Tr.") and Monica Titera ("Titera Discovery Tr."), subject to the evidentiary rulings *supra*;[20] and

- Printed publications (magazine and newspaper articles)[21] and printouts from opposer's website.[22]

Applicant made the following additional evidence of record by notice of reliance:

- The following registrations owned by applicant, all for "watches" in International Class 14 unless otherwise noted:

  o No. 3942099, I-KIDZ (registered April 5, 2011);[23]

  o No. 4119715, GALAXY (registered March 27, 2012);[24]

  o No. 3955723, JACK OF HEARTS for jewelry and watches (registered May 3, 2011);[25]

  o No. 2602318, SACHE (registered July 30, 2002);[26] and

  o No. 2673250, STUDIO TIME (registered January 7, 2003).[27, 28]

---

[19] *Id.*, Exhibits 7-16.

[20] *Id.*, Exhibits 17-26.

[21] *Id.*, Exhibits 27-62.

[22] *Id.*, Exhibit 63.

[23] Applicant's Notice of Reliance, Exhibit 1.

[24] *Id.*, Exhibit 2.

[25] *Id.*, Exhibit 3.

[26] *Id.*, Exhibit 4. This registration originally also covered clocks, which were deleted on renewal in July 2012.

[27] *Id.*, Exhibit 7.

[28] Applicant also submitted Registrations No. 2595607 for CRAZE (Exhibit 5, registered July 16, 2002) and No. 2613563 for LAX (Exhibit 6, registered August 27, 2002), both of which were cancelled in 2013, during the pendency of this proceeding.

- Portions of the discovery depositions of applicant's witnesses Bernard Mermelstein and Monica Titera, subject to the rulings *supra*;[29]

- Portions of the discovery deposition of opposer's trial witness, Patricia Higgins;[30]

- Excerpts from the file history of Registration No. 3942099, owned by applicant;[31] and

- Six third-party registrations, as discussed further *infra*.[32]

As noted, some of the evidence proffered by both parties has been designated as confidential and filed under seal. We will endeavor to discuss herein only in general terms any relevant evidence that has been submitted under seal and not disclosed by the parties in the unredacted portions of their public briefs.

<u>The Parties</u>

Opposer introduced its SWATCH-brand watches in the United States in the 1980s.[33] Although the numbers are designated confidential, opposer's U.S. sales and advertising figures are substantial. Opposer's flagship store in New York City's Times Square alone draws more than one million visitors per year.[34] In addition to its own extensive advertising and promotion, opposer's goods have been featured in many periodicals, including *The New York Times*, *Newsweek*, and *Popular Science*.[35]

Applicant is a family-owned business that manufactures, imports, and sells

---

[29] *Id.*, Exhibits 8-9.

[30] *Id.*, Exhibit 10.

[31] *Id.*, Exhibit 11.

[32] *Id.*, Exhibits 12-18.

[33] *See* Higgins Tr. at 20:7-22:12.

[34] *Id.* at 28:14-29:11.

[35] *Id.* at Exhibits 13-15.

Opposition No. 91187092

watches, clocks, and personal care products.[36]  Watches constitute the majority of
its current business.[37]  Applicant has been in the watch business for 60 years, sold
many styles of watches, and shipped more than 20 million timepieces a year as of
2010.[38]  Applicant sells watches under many different brands, some of which it
licenses from others and some that it creates itself.[39]

<u>Standing and Priority</u>

Applicant does not dispute opposer's standing or priority in the SWATCH
mark.  Opposer's standing to oppose registration of applicant's mark is established
by its pleaded registrations, which the record shows to be valid and subsisting, and
owned by opposer.  *See, e.g., Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55
USPQ2d 1842, 1844 (Fed. Cir. 2000) (party's ownership of pleaded registration
establishes standing).  In addition, because opposer's pleaded registrations are of
record, priority is not an issue with respect to the goods and services covered by
opposer's pleaded registrations.  *Penguin Books Ltd. v. Eberhard*, 48 USPQ2d 1280,
1286 (TTAB 1998) (citing *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d
1400, 182 USPQ 108, 110 (CCPA 1974)).  There is no dispute that opposer has
priority vis-à-vis applicant, which filed the involved application on an intent-to-use
basis in 2007.

---

[36] Russo Tr. at 5:13-20; Opposer's Notice of Reliance, Exhibit 17 ("Mermelstein Tr.") at
15:16-16:5, 17:9-16.

[37] Gordon Tr. at 9:21-23; Mermelstein Tr. at 17:20-24.

[38] *See* Gordon Exhibit 4 and Gordon Tr. at 6:19-8:9.

[39] Russo Tr. at 7; *see also* Applicant's Notice of Reliance, Exhibits 2-7.

Opposition No. 91187092

<u>Likelihood of Confusion</u>

"We determine likelihood of confusion by focusing on . . . whether the purchasing public would mistakenly assume that the applicant's goods originate from the same source as, or are associated with, the goods in the cited registrations." *In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). We consider all probative facts in evidence that are relevant to the likelihood of confusion factors set forth in *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). Opposer must establish that there is a likelihood of confusion by a preponderance of the evidence. *Cunningham*, 55 USPQ2d at 1848.

In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."). Any one factor may control in a particular case. *In re Dixie Rests., Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533 (Fed. Cir. 1997). We have considered each of the *du Pont* factors as to which the parties submitted argument or evidence. To the extent that any other *du Pont* factors for which no evidence was presented may nonetheless be applicable, we treat them as neutral.

Applicant has applied to register the mark IWATCH for watches, clocks, and parts thereof. Opposer's registered mark is SWATCH, in plain and stylized form,

Opposition No. 91187092

for goods including watches, clocks, and parts thereof; retail shops featuring watches; and jewelry.

The identification of applicant's goods is not restricted and applicant does not dispute that the goods of the parties are in part identical, giving rise to the presumption that the channels of trade and classes of purchasers are the same. *See American Lebanese Syrian Associated Charities Inc. v. Child Health Research Inst.*, 101 USPQ2d 1022, 1028 (TTAB 2011); *In re Smith & Mehaffey*, 31 USPQ2d 1531, 1532 (TTAB 1994) ("Because the goods are legally identical, they must be presumed to travel in the same channels of trade, and be sold to the same class of purchasers."). There is no showing that the parties' customers are sophisticated, and their goods are relatively inexpensive, with applicant's watches selling for as little as $5.[40] Nor does applicant dispute the extensive evidence of fame of the SWATCH mark introduced by opposer, which we find to be sufficient to prove that the mark is famous for purposes of the likelihood of confusion analysis. Thus, based on the record evidence, we find that *du Pont* factors two (similarity of the goods), three (similarity of trade channels), four (customers and conditions of sale), and five (fame of the prior mark) weigh in opposer's favor.

Applicant introduced the following third-party registrations, all for goods consisting of or including watches:

- AWATCH[41]

---

[40] Gordon Tr. at 11:24-12:7.

[41] Registration No. 1420954.

12

Opposition No. 91187092

- MY WATCH[42]
- SKYWATCH[43]
- SHOTWACH[44]
- LE WATCH[45]
- WATCH US[46]

Applicant characterizes this evidence as relating to *du Pont* factor six – the number and nature of similar marks in use on similar goods – but acknowledges that the registrations it submitted are not evidence of use of the marks shown therein.[47] Applicant also suggests that these registrations demonstrate the suggestive or descriptive nature of the term "watch."[48]

"Watch" is not, however, merely descriptive or suggestive; it is a generic term for the parties' watches. The incorporation of this term into both parties' marks[49] is not a sufficient basis for finding likelihood of confusion. It is well-settled that descriptive or generic matter may have little or no significance in likelihood of confusion determinations, and the fact that this generic root is common to the parties' marks does not render them similar. *See Cunningham*, 55 USPQ2d at 1846

---

[42] Registration No. 1413285.

[43] Registration No. 3915041.

[44] Registration No. 3593758.

[45] Registration No. 2180402.

[46] Registration No. 2172185.

[47] *See Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 57 USPQ2d 1557, 1561 (Fed. Cir. 2001); *AMF Inc. v. American Leisure Prods., Inc.*, 474 F.2d 1403, 177 USPQ 268, 269 (CCPA 1973); *In re Max Capital Group Ltd.*, 93 USPQ2d 1243, 1248 (TTAB 2010).

[48] *See* Applicant's Brief at 21.

[49] While "swatch" is a word in its own right, when it is used as a mark for watches, the presence of "watch" within "swatch" will be apparent to prospective consumers.

13

Opposition No. 91187092

("Regarding descriptive terms, this court has noted that the 'descriptive component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion.'") (quoting *In re Nat'l Data Corp.*, 224 USPQ at 752); *In re Dixie Rests., Inc.*, 41 USPQ2d at 1533-34.

In determining whether there is a likelihood of confusion, we are mindful that fame, where it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use, and we accord them extreme deference. *Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000).

Nonetheless, when we address the first *du Pont* factor, the similarity or dissimilarity of the marks, we find that applicant's mark IWATCH differs significantly from opposer's mark SWATCH in sound, meaning, and overall commercial impression. Opposer's mark is a distinctive, one-syllable term beginning with the sibilant consonant blend "SW." Applicant's mark, in contrast, is a two-syllable telescoping of the terms "I" and "WATCH" beginning with the long "I" vowel sound.

Opposer emphasizes that applicant's mark, like its own, adds only a single initial letter to the common root "WATCH." While this fact may lend some visual similarity to the two marks, even the letters "I" and "S" – likely to draw attention as

Opposition No. 91187092

initial letters[50] – are readily distinguishable in both appearance and in meaning. Viewed in the context of applicant's identified goods, the initial term "I" could lend itself to a number of different consumer interpretations, including as a well-established reference to "interactive"; a personal pronoun; or a double entendre playing on the verb form of the term "watch."  Opposer's mark SWATCH has none of these meanings.

As will be discussed further *infra*, after receiving a descriptiveness refusal, applicant represented during prosecution that "there will be no interactive features" on its IWATCH products:  "The 'i' does not refer to any particular feature of the watches or clocks.  The 'i' is purely arbitrary."[51]  Nonetheless, applicant's owner deemed the mark appropriate for some sort of technology or "information" watch.[52]

In sum, under the first *du Pont* factor, we find that the sound, meaning, appearance, and overall commercial impression of the marks SWATCH and IWATCH are sufficiently dissimilar to render confusion unlikely.  *See, e.g., Bulova Watch Co. v. Miller*, 463 F.2d 1376, 175 USPQ 38, 39 (CCPA 1972) (holding that UNITRON and ACCUTRON for watches "just do not look alike, sound alike or connote alike"); *Claremont Polychemical Corp. v. Atlantic Powdered Metals, Inc.*, 470 F.2d 636, 176 USPQ 207, 208 (affirming that EVERGOLD for metal powder is unlikely to cause confusion with DURAGOLD for a bronze gold pigment for

---

[50] *See Presto Prods. Inc. v. Nice-Pak Prods. Inc.,* 9 USPQ2d 1895, 1897 (TTAB 1988) (noting that "it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered").

[51] May 1, 2008 response to Office action.

[52] Mermelstein Tr. at 102:16-25.

decorative uses). *Cf. Swatch Watch, S.A. v. Taxor, Inc.*, 785 F.2d 956, 229 USPQ 391, 392 (11th Cir. 1986) (affirming denial of preliminary injunction early in opposer's history because no likelihood of confusion between SWATCH and T-WATCH for watches).

Thus, despite the *du Pont* factors that favor opposer, in this case the dissimilarity of the marks is determinative. "We know of no reason why, in a particular case, a single *du Pont* factor may not be dispositive." *Kellogg Co.* v. *Pack'em Enters. Inc.*, 951 F.2d 330, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991); *see also Citigroup Inc. v. Capital City Bank Group Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1260 (Fed. Cir. 2011) (stating that the Board need not discuss each *du Pont* factor and may find a single factor dispositive). Opposer has submitted argument with respect to the remaining *du Pont* factors, but there is insufficient evidence to find that any of them favor opposer. Even if all remaining *du Pont* factors are weighed in favor of opposer, they would be insufficient to overcome the substantial differences between the marks SWATCH and IWATCH. Opposer's claim under Section 2(d) of the Trademark Act is therefore dismissed.

<u>Bona Fide Intent</u>

Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), states that:

> A person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce may request registration of its trademark on the principal register hereby established by paying the prescribed fee and filing in the Patent and Trademark Office an application and a verified statement, in such form as may be prescribed by the Director.

Opposition No. 91187092

Opposer has the burden of demonstrating by a preponderance of the evidence that applicant lacked a bona fide intent to use the mark on the identified goods at the time it filed its application. We note at the outset that our inquiry is not into applicant's subjective state of mind alone. Rather, evidence of circumstances bearing on intent

> is "objective" in the sense that it is evidence in the form of real life facts and by the actions of the applicant, not by the applicant's testimony as to its subjective state of mind. That is, Congress did not intend the issue to be resolved simply by an officer of applicant later testifying, "Yes, indeed, at the time we filed that application, I did truly intend to use the mark at some time in the future."

*L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1444 (TTAB 2012) (quoting 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 19:14 (4th ed. 2009)); *see also SmithKline Beecham Corp. v. Omnisource DDS LLC*, 97 USPQ2d 1300, 1305 (TTAB 2010); *Research In Motion Ltd. v. NBOR Corp.*, 92 USPQ2d 1926, 1931 (TTAB 2009).

Thus, as we have consistently held, our determination whether an applicant has a bona fide intention to use the mark in commerce is an objective determination, based on all the circumstances. *Boston Red Sox Baseball Club L.P. v. Sherman*, 88 USPQ2d 1581, 1587 (TTAB 2008); *see also Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 86 USPQ2d 1527, 1537-38 (D.C. Cir. 2008) ("Here, Congress made clear that a 'bona fide intent to use' also involves an objective standard by specifying there must be 'circumstances showing . . . good faith.' Thus, an opposer may defeat a trademark application for lack of bona fide intent by proving the applicant did not actually intend to use the mark in

17

commerce or by proving the circumstances at the time of filing did not demonstrate that intent.").

One way an opposer can establish its prima facie case of no bona fide intent is by proving that applicant has no documentary evidence to support its allegation in the application of its claimed bona fide intent to use the mark in commerce as of the application filing date. *Saul Zaentz Co. v. Bumb*, 95 USPQ2d 1723, 1727 (TTAB 2010). The absence of any documentary evidence regarding an applicant's bona fide intention to use a mark in commerce is sufficient to prove that an applicant lacks the intention required by Section 1(b) of the Trademark Act, unless other facts are presented which adequately explain or outweigh applicant's failure to provide such documentary evidence. *See Honda Motor Co. v. Winkelmann*, 90 USPQ2d 1660, 1662 (TTAB 2009); *L.C. Licensing Inc. v. Berman*, 86 USPQ2d 1883, 1891 (TTAB 2008). If opposer satisfies its initial burden of showing the absence of documentary evidence regarding applicant's bona fide intention to use the mark, the burden of production shifts to applicant to come forward with evidence adequately explaining or outweighing the failure to provide such documentary evidence. *See Commodore Elecs. Ltd. v. CBM Kabushiki Kaisha*, 26 USPQ2d 1503, 1507 n. 11 (TTAB 1993).

We first consider the documentary evidence relating to applicant's bona fide intention to use the IWATCH mark in commerce. The few documents of record appear to relate only to the trademark application. Beyond the application file, the

entire universe of documentary evidence produced by applicant relating to the

IWATCH mark[53] consists of:

    (1)    A trademark search of Class 14 conducted by Monica Titera, the employee who handles applicant's trademark applications, four days before she filed the application on July 9, 2007.[54]

    (2)    An internal email dated May 2, 2008 relating Ms. Titera's discussion with the examining attorney. The email, subject "iWatch & iClock update," essentially echoes the wording of a response to an Office action submitted by Ms. Titera the previous day. The message is addressed to Mr. Mermelstein (copying in-house counsel Mr. Kuritzky and chief merchant and marketing officer Ms. Gordon) and states:

> I spoke with the Examining Atty at the PTO, and explained that the goods for the iWatch & iClock names will not have any interactive features. The images we previously submitted were just mock-ups to show a buyer. The buyer decided that models which previously had interactive features were too expensive, but was still interested in the name. Thus, there won't be any interactive features on any models.
>
> The Atty said this is fine, and advised that we add in our response that the "I" is purely arbitrary, and does not refer to any particular feature of the watches or clocks.
>
> **Bottom line:** she will withdraw her refusal, and we are moving to the next phase – publication.[55]

    (3)    Three internal emails forwarding pictures of three stylized versions of the IWATCH mark, as well as images of one clock and two apparently identical watches featuring the IWATCH mark.[56]

---

[53] Portions of these documents also concern applicant's application to register the mark ICLOCK, which is neither before us nor of record.

[54] Titera Tr. at 6:24-8:9 and Exhibit 6.

[55] *Id.* at 14:4-15:21 and Exhibit 9. The representation on buyer feedback is discussed *infra*.

[56] *Id.* at 9:19-14:3 and Exhibit 7; Russo Exhibit 2 and Russo Tr. at 26:11-29:14, 64:17-69:11; Opposer's Notice of Reliance, Exhibit 20.

Opposition No. 91187092

Applicant acknowledged through its testimony that it ceased any work on developing a watch in association with the IWATCH mark when the opposition proceeding began on October 22, 2008, fifteen months after the application was filed. It appears that no documents relating to the IWATCH mark other than those just listed ever existed. In its brief, applicant stated that its witnesses "testified that no records or other types of documents were created. At most, that leaves just emails which may have been exchanged."[57]

The images of the clock and watches displaying an IWATCH logo appear in the record as follows:

---

[57] Applicant's Brief at 9 n.4. We note that Marci Gordon, applicant's chief merchant and marketing officer, testified that she takes personal notes at product development meetings, but discarded all her notes for 2008 at the end of that year, two months after this proceeding commenced. *See* Gordon Tr. at 13:16-17:15, 42:6-48:9; *see also* Russo Tr. at 10:20-11:4. Given the statement in applicant's brief, we will not infer that Ms. Gordon's notes would have referenced any plans having to do with the IWATCH mark.



A. 21



These images apparently were created in February 2008. In the internal emails mentioned in category 3 *supra*, the pictures were sent by applicant's creative art director to chief merchant and marketing officer Marci Gordon (who testified, however, that she did not recall seeing renderings of any IWATCH products, including these[58]) and to Ms. Titera, who asked the creative art director to resize some of the images so they were in a format acceptable for submission to the Office.[59] Shortly thereafter, in March 2008, Ms. Titera submitted the images to the

---

[58] Gordon Tr. at 48-49.

[59] *See supra* n.56; Titera Tr. at 11:5-20, Exhibit 7 and errata.

Opposition No. 91187092

Office in response to a request for more information about the goods identified in the application, that is, for "samples of advertisements or promotional materials for goods of the same type."[60] Ms. Titera described these submissions as "samples of promotional materials of both watches and clocks."[61]

Under our precedent, the fact that these documents were created seven months after the trademark application was filed is not dispositive. In *Lane Ltd. v. Jackson Int'l Trading Co.*, 33 USPQ2d 1351, 1355 (TTAB 1994), the Board found documentary evidence created nine to eleven months after the application was filed to be sufficiently contemporaneous evidence of intent. "Neither the statute nor the Board's decision in *Commodore Electronics* expressly imposes any specific requirement as to the contemporaneousness of an applicant's documentary evidence corroborating its claim of bona [f]ide intention. Rather, the focus is on the entirety of the circumstances, as revealed by the evidence of record." *Lane Ltd.*, 33 USPQ2d at 1356.

Applicant's witnesses disagree about what the submitted pictures represent:

- Ms. Russo testified that the images show an actual mockup of a previously developed watch prepared for an internal meeting, probably in 2007 or 2008, by printing out the IWATCH logo and putting it onto the watch. Ms. Russo testified: "Q. Do you know if these are actually mock-ups of watches and clocks? A. I believe these are actuals, yes. These are not renderings. These are actual photos."[62] Ms. Russo testified that she was not involved with the trademark application, but

---

[60] October 5, 2007 Office action.

[61] March 21, 2008 response to Office action.

[62] Russo Tr. at 64:17-68:6, 27:15-18 and Exhibit 2. Ms. Russo testified that she did not see the prototype watch before or after the meeting and did not know what happened to it. *Id.* at 66:17-67:16.

believed that a prototype watch and clock "were prepared for internal meetings, strategy meetings. And pictures were then taken and sent for trademark. I think that's how it happened."[63]

- Ms. Titera also characterized the images as mockups.[64]

- In contrast, Mr. Mermelstein, applicant's CEO and 30(b)(6) witness, testified that no mockup watches were made, and these images were created "[p]ossibly, probably in relation to the application for trademarking maybe."[65] After reviewing the application later during his discovery deposition, Mr. Mermelstein testified: "Q. Okay. And you had mentioned earlier that you believe these images were created for part of a trademark application? A. I thought that they might be. Q. Does this refresh your recollection that they were? A. Yes."[66]

- In the same vein, in a February 2008 email forwarding images that included the two IWATCH watches, the creative art director suggested the images are actually renderings, writing that "I will finish other renderings for clocks."[67]

Although creation of mockups and renderings is a normal part of applicant's product development process,[68] there is no physical or documentary evidence relating to any IWATCH mockups or renderings other than the "samples of promotional materials" submitted to the Office, which apparently were used only in support of the application and not for any promotional or other purpose.[69]

We note that in some cases, a trademark clearance search may be probative evidence of a bona fide intent to use. However, based on all the circumstances here,

---

[63] *Id.* at 65:12-69:4.

[64] Titera Tr. at 9:23-10:3, Exhibits 7 and 9.

[65] Mermelstein Tr. at 111-12.

[66] *Id.* at 124:23-125:5.

[67] Opposer's Notice of Reliance, Exhibit 9.

[68] Russo Tr. at 27:4-18; Gordon Tr. at 23:5-24:24, 48:10-49:11.

[69] Mermelstein Tr. at 112:16-22.

Opposition No. 91187092

including the timing of the creation of the only documents of record and the inconsistent evidence as to what the images submitted to the Office depict, these documents do not establish applicant's intention to use the IWATCH mark in commerce at the time the application was filed. *Cf. Research In Motion Ltd.*, 92 USPQ2d at 1931 ("If the filing and prosecution of a trademark application constituted a bona fide intent to use a mark, then in effect, lack of a bona fide intent to use would never be a ground for opposition or cancellation, since an inter partes proceeding can only be brought if the defendant has filed an application.").

We turn next to the remaining record evidence, in particular, testimony from applicant's witnesses. The goods identified in the application can be characterized as falling into three major categories: clocks; watches; and goods that may be incorporated in or related to watches and/or clocks (e.g., clock dials and watch fobs).

First, there is probative evidence that applicant did not intend to use the IWATCH mark for any kind of clocks. Mr. Mermelstein – applicant's owner, CEO, and corporate representative – testified that he did not expect the IWATCH mark to be used for clocks at the time he directed Ms. Titera to file the application.[70] Applicant argues that "Mr. Mermelstein's testimony clearly reflects that he was expressing his own understanding at the present time, not that of the company at the time the application was filed."[71] In most pertinent part, Mr. Mermelstein testified as follows: "Q. At the time you filed the application you didn't expect the

---

[70] *Id.* at 104:18-105:15.

[71] Applicant's Brief at 11.

Opposition No. 91187092

IWATCH mark to be used for clocks and personal care products? A. No. Correct."[72] The testimony is clear, particularly in the context that Mr. Mermelstein, applicant's owner and CEO, created the mark and instructed Ms. Titera to file the application. Moreover, as applicant's sole designated 30(b)(6) witness, Mr. Mermelstein was testifying on behalf of the company as its corporate representative. Thus, we treat this testimony as representing the views of the company at the time the application was filed.

Second, the evidence indicates that applicant did not have a bona fide intent to use the IWATCH mark on subsidiary goods.[73] Ms. Titera testified that Mr. Mermelstein instructed her to apply to register the IWATCH mark only for watches and clocks.[74] Instead, she included more than 30 goods in the application "to leave all doors open."[75] Although Ms. Titera testified that this was applicant's standard list of goods for trademark applications, we do not find that inclusion of the subsidiary goods in the face of Mr. Mermelstein's instructions to register the mark only for watches and clocks represents bona fide intent on applicant's part.

---

[72] Mermelstein Tr. at 105:11-15.

[73] We continue with an analysis as to the other goods identified in the application because we deem the documentary evidence of record here – in particular, the trademark search – to relate to all identified goods. We therefore consider applicant's alleged lack of a bona fide intention to use the mark with respect to all identified goods, based on an objective analysis of the entirety of the circumstances. *Cf. Spirits Int'l, B.V. v. S.S. Taris Zeytin Ve Zeytinyagi Tarim Satis Kooperatifleri Birligi*, 99 USPQ2d 1545 (TTAB 2011).

[74] Titera Discovery Tr. at 47:14-48:7.

[75] *Id.* at 53:11-15; *see also id.* at 48:14-56:4.

26

Moreover, no other applications or registrations of record include this "standard" list.[76]

Watches, the remaining category of goods, present a closer issue.[77] Applicant's witnesses testified that they held internal brainstorming sessions and merchandising meetings regarding what applicant might do with the IWATCH mark.[78] The only evidence beyond such internal meetings relates to a conversation with a buyer, and that evidence is both vague and conflicting, as we now review in detail.

As noted, after receiving a descriptiveness refusal, applicant represented to the Office that its IWATCH products would have no interactive features. In a May 2008 response to an Office action, Ms. Titera stated that "a buyer liked the IWATCH name but deemed the models with interactive features to be too expensive."[79] Opposer asked about this representation in an interrogatory:

> INTERROGATORY NO. 35: Identify all third parties (including, but not limited to, "the buyer" referenced in Applicant's May 1, 2008 Response to Office Action) with whom Applicant's employees/agents discussed the development and/or purchase of products bearing Applicant's Mark.
>
> ANSWER: Applicant's officers and employees have no specific recollection of which third party or parties they

---

[76] *See id.*; Applicant's Notice of Reliance Exhibits 1-7, 11.

[77] In addition to "watches," the application identifies the following specific types of watches: "Diving watches; Jewelry watches; Pocket watches; Stop watches; Watches containing a game function; Wrist watches."

[78] *See* Gordon Tr. at 17:16-19:12, 38:5-44:25, 50:13-51:23; Russo Tr. at 9:17-16:3; Kuritzky Tr. at 5:20-11:12.

[79] May 1, 2008 response to Office action.

> discussed the IWATCH mark with, or which buyer is
> referred to in the Response to Office Action, as the events
> took place almost four years ago, and Applicant's sales
> personnel routinely meet with many different buyers and
> potential customers on a daily basis, either at Applicant's
> offices or at the offices of customers and potential
> customers, and they do not always keep records of such
> meetings, the dates on which they take place, or the
> locations at which they take place. Further, many such
> meetings are informal and include discussions about a
> variety of potential brands and products.[80]

Ms. Titera testified that the representation to the Office regarding buyer feedback was based on "discussions that we had at the time."[81] This testimony is contradicted by the only witness who testified that she discussed the IWATCH mark with a buyer. Ms. Russo, applicant's vice president of merchandising, testified that she believed she had a perhaps three-minute conversation with a buyer about the IWATCH mark, although she could remember little about the meeting – even the year it occurred – except that the buyer was a woman, the discussion likely took place in applicant's showroom, and a retail price of an IWATCH watch was discussed as being under a specific, relatively modest dollar amount (designated confidential and not disclosed in the parties' public briefs).[82] Ms. Russo further testified that she mentioned certain "techy features" that the watch had to have[83] – features that can be characterized fairly as interactive. When

---

[80] Opposer's Notice of Reliance Exhibit 11, Applicant's Response to Opposer's Interrogatory No. 35.

[81] Titera Tr. at 14:9-15:21; *see also* Titera Discovery Tr. at 41:3-23.

[82] Russo Tr. at 25:15-29:15, 54:7-67:16, 72:11-16.

[83] *Id.* at 58:8-15 (designated as confidential).

asked whether development of an IWATCH watch did not go forward because buyers thought the watch would be too expensive, Ms. Russo answered "no."[84]

Mr. Mermelstein, on the other hand, testified that no certain kinds of watches or features were intended to be sold under the IWATCH mark, and indeed that the mark was never discussed outside of applicant's office at all, except with counsel in the opposition proceeding.[85]

In other cases, Ms. Titera's statement to the Office might have carried more weight. Here, however, its substance is directly contradicted both by Mr. Mermelstein, applicant's CEO and 30(b)(6) witness, and by Ms. Russo, a witness with firsthand knowledge. We do not view this particular evidence regarding a discussion with a buyer as a circumstance demonstrating applicant's bona fide intent to use the IWATCH mark at the time it filed the application.

Mr. Mermelstein, moreover, testified that he created the IWATCH mark "because of the advent of technology and information gathering around the globe over the last I guess few years, I thought that *if* we decided to do a – either a technology watch or information watch or something that would have that type of characteristics that [IWATCH] would be a good mark for it." (emphasis added).[86] As Steven Kuritzky, vice president of business affairs and in-house counsel, testified, Mr. Mermelstein

---

[84] *Id.* at 71:11-72:7.

[85] Mermelstein Tr. at 103:11-107:2, 112:16-113:20.

[86] *Id.* at 102:16-25 (emphasis added); *see also id.* at 103-06, 116-17.

Opposition No. 91187092

> threw it out saying, you know, I'm going to apply for the
> iWatch name, the trademark, let's discuss some things
> that we can do with it, how to use it as a brand, whether
> it would be a high-tech watch, what would the logo look
> like, how should we position this in the market, and there
> were ideas on how we might do that.[87]

Applicant's witnesses testified that they had not previously made any watch with technological features and would have had to outsource development of the IWATCH "smart watch" product.[88]  But applicant's witnesses testified that they never took any step toward developing any such features, contemporaneous with filing the application or afterward.  This testimony is consistent with the paucity of documentary evidence and supports a finding that applicant lacked a bona fide intent to use the IWATCH mark in commerce.  We recognize that the application is not restricted to watches that are "interactive" or have high-tech features.  However, the evidence shows that applicant's idea was to use the IWATCH mark only in association with a "smart" watch, incorporating technological features that applicant had never offered and made no plans to even begin developing or sourcing at any time before or in the fifteen months after it filed its application and before this opposition was brought.

Applicant argues that its intent to use the IWATCH mark is corroborated by its use of the mark I-KIDZ, which it has registered for watches.[89]  Applicant does not argue, and there is no evidence, that its I-KIDZ watches incorporate any of the

---

[87] Kuritzky Tr. at 7:14-23.

[88] Gordon Tr. at 18-19; Russo Tr. at 27:25-28:6.

[89] Applicant's Notice of Reliance, Exhibit 1.

technology features for which it assertedly had the idea to use the IWATCH mark. Moreover, the I-KIDZ application was not filed until April 9, 2010 – nearly three years after the IWATCH application was filed in July 2007. Applicant also offered testimony in 2012 that it was in development to market a watch under the mark iMove.[90]  Because we must consider applicant's intent at the time the application was filed, these subsequent efforts do not establish intent to use the different mark IWATCH several years earlier. *See Boston Red Sox Baseball Club L.P.*, 88 USPQ2d at 1587 (characterizing actions taken two years and four months afterward as "not even remotely contemporaneous with the filing of the application").  The circumstances here are thus readily distinguishable from the contingent situations contemplated in the legislative history of the amendment of the Trademark Act to create the intent-to-use filing system: "An applicant's bona fide intention to use a mark must reflect an intention that is firm, though it may be contingent on the outcome of an event (that is, market research or product testing)."[91]

In our analysis of whether applicant had the requisite intent-to-use, we have considered the fact that applicant has long been in the business of making and selling watches and clocks. The Board has repeatedly found a lack of bona fide

---

[90] Applicant's Brief at 2 and 13 n.7 (citing Gordon Tr. at 8-9, 64 and 67).

[91] S. Rep. No. 100-515, at 24 (1988), *reprinted in* USTA, "THE TRADEMARK LAW REVISION ACT OF 1988" 176 (1989) ("USTA").  The Senate Judiciary Committee Report analysis of the Act also observes that: "Bona fide intent is measured by objective factors.  A statement of intent to use a mark on specifically identified products in the future may be sufficient.  An applicant may safely make this statement in its original application without having taken concrete steps to create and introduce a new product, provided that in fact it intends to use the mark.  However, other circumstances may cast doubt on the bona fide nature of the intent or even disprove it entirely." *Id.* at 23, *reprinted in* USTA at 175.

Opposition No. 91187092

intent to use a mark by individuals who lack the demonstrated capacity to produce the goods identified in the application. *See, e.g.*, *L'Oreal S.A.*, 102 USPQ2d 1434; *Saul Zaentz Co.*, 95 USPQ2d 1723; *Boston Red Sox Baseball Club L.P.*, 88 USPQ2d at 1581. Conversely, we have previously stated, and hereby reaffirm, that an applicant's capacity to market and/or manufacture the identified goods is evidence that weighs against a finding that an applicant lacked bona fide intent to use. *See Wet Seal, Inc. v. FD Mgmt., Inc.*, 82 USPQ2d 1629, 1643 (TTAB 2007). Each case, however, must be decided through an objective determination based on all the circumstances of record. Here, the record contains (1) applicant's testimony that it actually did not intend to use the IWATCH mark for clocks when the application was filed; (2) testimony indicating that applicant lacked an intent to use the mark on the identified subsidiary goods; and (3) contradictory testimony regarding applicant's effort to develop and market an IWATCH-brand watch.

We have carefully considered all of the parties' arguments and evidence in the record, even if not specifically discussed herein. We find, based on the record before us, that applicant's intent at the time it filed its application was "merely to reserve a right in a mark" in case it made the firm decision to begin developing an associated product at some future time, rather than to use that mark in commerce as defined in Section 45 of the Trademark Act on the identified goods. As we have previously held, mere intent to reserve rights in a mark does not equate to bona fide intent to use a mark. *See, e.g.*, *Saul Zaentz Co.*, 95 USPQ2d at 1726-27; *cf. Research In Motion Ltd.*, 92 USPQ2d at 1931 (finding the fact that applicant's chief executive

officer "believed BLACK MAIL to be a good mark for future use does not establish a bona fide intent to use").  Viewing all circumstances objectively, we cannot conclude that applicant's actions reveal a bona fide intention to eventually use the mark in a real and legitimate commercial sense on any of the identified goods at the time it filed the application.  Therefore, we find that opposer has established, by a preponderance of the evidence, that applicant lacked a bona fide intent to use the mark IWATCH at the time it filed its application.

*Decision*:  We dismiss the opposition on the ground of likelihood of confusion and sustain the opposition solely under Trademark Act Section 1(b).

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C)(i), I hereby certify that this brief is proportionately spaced; uses a Roman-style, serif typeface (Century Schoolbook) of 14-point; and contains **9,239 words**, exclusive of the material not counted under Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

/s/ Robert T. Smith
Robert T. Smith
*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Non-Confidential Brief of Appellant with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on May 2, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Robert T. Smith
Robert T. Smith
*Counsel for Appellant*